# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON

FOR PUBLICATION

| | |
|---|---|
| STATE OF TENNESSEE, | ) **Filed:** April 13, 1998 |
| | ) |
| Appellee, | ) Shelby County |
| | ) |
| v. | ) Hon. W. Fred Axley, |
| | ) Judge |
| PERRY A. CRIBBS, | ) |
| | ) |
| Appellant, | ) Supreme Court |
| | ) No. 02S01-9703-CR-00014 |

**FILED**

**April 13, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

FOR APPELLANT:

A.C. Wharton
District Public Defender
30th Judicial District
Memphis, Tennessee

W. Mark Ward
Assistant Public Defender
Memphis, Tennessee

Ron Johnson and
Betty Thomas
Assistant Public Defenders
Memphis, Tennessee

FOR APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

John P. Cauley
Assistant Attorney General
Nashville, Tennessee

John W. Pierotti
District Attorney General
30th Judicial District
Memphis, Tennessee

James Wax and
David Shapiro
Assistant District Attorneys General
Memphis, Tennessee

# O P I N I O N

TRIAL COURT AND
COURT OF CRIMINAL APPEALS AFFIRMED.                    DROWOTA, J.

In this capital case, the defendant, Perry Cribbs, was charged with premeditated first degree murder, first degree murder during the perpetration of an aggravated burglary, and first degree murder during the perpetration of aggravated robbery for killing the victim, Linda Harris, in her home on January 2, 1994. The jury found the defendant guilty on all three counts.[1] In the sentencing hearing, the jury found two aggravating circumstances: (1) "[t]he defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;" and (2) "[t]he murder was committed while the defendant was engaged in committing or was attempting to commit, a burglary." Tenn. Code Ann. § 39-13-204(i)(2) and (7) (1991 Repl.). Finding that the two aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

At the hearing on the motion for a new trial, conducted some weeks after the jury rendered its verdicts, the trial court set aside the jury's verdicts of guilt on the charges of premeditated first degree murder and first degree murder during the perpetration of aggravated robbery. The trial court entered a judgment upholding the jury's verdict of guilt on the charge of first degree murder during the perpetration of an aggravated burglary and the sentence of death by electrocution.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both his conviction and sentence, raising nine claims of error, some with numerous subparts. After fully considering the defendant's claims, the Court of Criminal

---

[1]Cribbs was also convicted of aggravated burglary and attempted first degree murder. The trial court imposed consecutive, Range II sentences of ten and forty years, respectively, on these convictions.

Appeals affirmed the trial court's judgment. Thereafter, pursuant to Tenn. Code Ann. § 39-13-206(a)(1) (1997 Repl.),[2] the case was docketed in this Court.

The defendant raised numerous issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court, on September 2, 1997, entered an Order, limiting review at oral argument to seven issues and setting the cause for the November, 1997, term of this Court in Jackson. See Tenn. S. Ct. R. 12.[3]

After reviewing the record, we have determined that none of the alleged errors require reversal. Moreover, the evidence supports the jury's findings as to the aggravating and mitigating circumstances, and the sentence of death is not arbitrary or disproportionate to the sentence imposed in similar cases, considering the nature of the crime and the defendant. Accordingly, the judgment of the trial court and Court of Criminal Appeals upholding the defendant's conviction for first degree murder and sentence of death by electrocution is affirmed.

**FACTUAL BACKGROUND**

---

[2]"Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

[3]Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

The proof presented by the State at the guilt phase of the trial established that sometime between 1:30 a.m. and 1:45 a.m. on the morning of January 2, 1994, the victims, Sidney Harris, and his wife, Linda Harris, returned from a visit with friends to their home located at 4378 Cottonwood, in Memphis. As was his habit, Sidney Harris backed his car onto the carport, and then opened the door for his wife to enter the house. As she came through the kitchen door, Linda Harris was attacked and knocked to the floor by an unknown assailant. Sidney Harris struggled with this man, who was armed with a pistol, for approximately fifteen seconds, and had wrestled him to the floor when a second assailant, armed with a double barrel sawed-off shotgun, intervened and ordered Harris to release the first man.

With guns leveled upon him, the two intruders ordered Harris to sit in a chair located in the den of his home, which was just off the kitchen, about five feet from where his wife was located. At some point, the intruders asked Harris, "where is the dope?" and they told Harris they intended to shoot him. Though the lights were not on in the house during this time, Harris said the carport light shone through the open kitchen door and provided sufficient illumination for him to observe the facial features of the intruders. Harris observed the assailants for twenty to thirty seconds before the second assailant fired the shotgun, striking Harris in the left shoulder and hand. Harris lost consciousness for a time after he was shot. When he regained consciousness, the assailants were gone. Harris observed his wife's body lying in a pool of blood on the floor of the kitchen where she had been initially assaulted. Based upon the discovery of wadding material on the left side of her neck and powder burns on her body, the medical examiner testified that Linda Harris had sustained a contact shotgun wound to the left side of her head which would have

-4-

resulted in instantaneous death. Harris made his way to a neighbor's house, where he was able to summon assistance before again losing consciousness.

When the police arrived at the scene they found the house in disarray. The intruders apparently had gained entry to the house through an open bedroom window. Toys belonging to the victim's daughter were in that bedroom and visible on the videotape of the scene made by police.[4] The videotape also showed the body of Linda Harris in the kitchen, shotgun shells on the den floor, and bloodstains on the chair in which Sidney Harris had been sitting when he had been shot. There were several bullet holes in the wall to the left of the chair in the den.

Officer Donald Crow, a Memphis policeman, rode with Harris as he was transported to the hospital shortly after the shooting. Officer Crow testified that Harris described the first assailant in some detail, but stated that the man had been wearing a black ski mask. With respect to the second assailant, Harris, according to Officer Crow, said only that he was tall, thin, and wore a black ski mask. Sergeant Ronnie McWilliams of the Memphis police directed the investigation and interviewed Harris the day after the shooting. At that time, Harris said that he could not identify either of the two suspects because they had been wearing black ski masks. About a week later, Harris told a police officer that he could not get the "complexion" of the man with the shotgun. Sergeant McWilliams described Harris as being heavily sedated on the day after the murder and said that he had been in serious condition when the second statement had been taken. Harris could not remember speaking to police on the

---

[4]The victims' daughter was not at home when the crime occurred. She had spent the night with her aunt, the victim's sister.

night of the murder and recalled being sedated when he spoke with police the next day.  Thereafter, and at trial, Harris described the first assailant as a black man, wearing a light-colored sheer stocking mask, a denim jumpsuit, and gloves, approximately 6'1" in height, 240 pounds in weight, with a moustache, large round nose, thick eyebrows, and hair about one inch in length.[5]  Harris said the second assailant, who had shot him, also had been a black man, wearing a light-colored sheer stocking mask, a dirty light green or gold mechanic's jumpsuit and gloves. Harris said this man was taller and thinner than the first assailant, approximately 6'3" or 6'4" in height, and about 220 pounds in weight

At the time of this murder, the defendant was residing with Jacqueline Cannon, the mother of his daughter.  Cannon stated that on the night of the murder, the defendant, wearing blue jeans and a blue denim shirt, left their residence at approximately 9:00 or 10:00 p.m.  When he returned sometime around 1:00 a.m., Cannon said he was covered in blood from a "hit."  Cribbs told her that he had shot a man and a woman.  Cribbs explained that he had been hired to kill the man by another man who had been having an affair with the female victim. Cribbs said that he had killed both victims and claimed that he would be paid for the "hit" soon.  The next day, Cannon discovered at her residence a gold-faced Mickey Mouse watch with a leather wrist band with the words "genuine leather" imprinted on the back.  When she asked Cribbs about the watch, he explained that he had taken it from the home of the couple he had killed.

---

[5]This man was never identified nor apprehended by police.

Shortly thereafter, Cannon learned from news reports that a man and woman had been shot, as Cribbs claimed, on the night of January 2, 1994. The woman had been killed but the man survived the shooting. Because she feared Cribbs, Cannon did not relay her knowledge about the murder to the police at that time. Some four to six weeks later, however, Cribbs became angry with Cannon because he suspected she had told a neighbor about his role in the murder. Cribbs assaulted and beat Cannon, and she was hospitalized for three days, suffering, among other things, a punctured lung. Fearing for her life, Cannon related to her brother what Cribbs had told her about the murder. Her brother notified Crime Stoppers, and as a result, the police located and interviewed Cannon. Cannon eventually received $900 from Crime Stoppers, and her brother received $100.

Upon learning of the gold-faced Mickey Mouse watch from Cannon, police asked Sidney Harris if his wife had owned such a watch. Harris had been hospitalized for twenty-two days following the shooting and had not discovered the watch missing. When questioned by police, Harris confirmed that his wife had owned such a watch and that it had been among the items missing from the house after the murder. At this point, having reason to believe that the defendant may have been involved in the murder of Linda Harris, police compiled a photographic lineup of eight men, including the defendant, who matched the description given by Harris. Visibly shaken and emotional, Harris identified the photograph of Cribbs as "the mother ----- that shot me!" Harris previously had viewed two other photographic lineups, but had not identified anyone as the person who shot him and killed his wife. At trial, Harris also positively identified Cribbs as the man who shot him.

Based upon the proof summarized above, the jury found the defendant guilty of premeditated first degree; first degree murder during the perpetration of an aggravated burglary; and first degree murder during the perpetration of aggravated robbery. The defendant was also found guilty of aggravated burglary and attempted first degree murder.

The trial proceeded to the sentencing phase. The State relied upon the evidence presented during the guilt phase of the trial, and in addition, introduced proof to show that the defendant, twenty-three-years-old at the time of trial, previously had been convicted of two counts of attempted second degree murder and one count of aggravated robbery in 1990. Also introduced was testimony that the defendant had been convicted of attempted second degree burglary in 1989.

Testifying on his own behalf, Cribbs said that he had been born in Alabama, but had lived in Shelby County for about nine years. The defendant's mother, grandfather, and two brothers, twenty-six and seventeen, resided in Armory, Mississippi at the time of the trial. Because of his grandfather's illness and obligations at work or school, none of his family were able to attend his trial. Cribbs said that his family had visited him on the Sunday prior to trial, and that visit had been the first time he had seen his mother in four years. Cribbs had a cousin in Memphis and previously had been employed by his uncle's construction company, but none of his family members attended the trial or testified on his behalf. Cribbs said that he had told his aunt that the trial was a matter of life or death, but he had not pressed his mother to attend the trial because she had been ill, and he did not want to worry her. Cribbs said that he had attended school through the seventh grade but had

dropped out when he was expelled for truancy. Of the twelve-year sentence he received on the convictions for attempted second degree murder and robbery, Cribbs had been incarcerated for three and one-half years in prison and had not violated prison rules during that time. Cribbs said that he had visited with his only child, a daughter, seven or eight times since being arrested for the murder of Linda Harris. Cribbs denied committing the crime for which the jury had convicted him, and he said that he had refused to plead guilty in exchange for a life sentence because he had not committed the crime. Cribbs explained that Cannon had falsely implicated him in the murder because she was angry. Cribbs said that he had argued with Cannon because "she stole some money from me. I had whooped her real bad and told her I wasn't going to come around no more.... So she came in and said this on me." Cribbs denied having any knowledge of a gold-faced Mickey Mouse watch. Lastly, Cribbs asked the jury to spare his life, saying that he would conduct himself as a decent individual in prison if given a sentence of life imprisonment without the possibility of parole.

Based upon the proof, the jury found that the State had proven the existence of two aggravating circumstances beyond a reasonable doubt: (1) "[t]he defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;" and (2) "[t]he murder was committed while the defendant was engaged in committing or was attempting to commit, a burglary." Tenn. Code Ann. § 39-13-204(i)(2) and (7) (1991 Repl.). Finding that the two aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

– 9 –

Following the hearing on the motion for new trial, the trial court set aside the jury's findings of guilt and sentences of death on the charges of premeditated first degree murder and first degree murder during the perpetration of aggravated robbery. The trial court entered a judgment of conviction upon the jury's verdict of guilt on the charge of first degree murder during the perpetration of an aggravated burglary and the sentence of death by electrocution. The Court of Criminal Appeals affirmed the judgment of the trial court. For the reasons that follow, after carefully reviewing the record and considering the errors assigned by the defendant, we affirm the judgment of the trial court and Court of Criminal Appeals upholding the defendant's conviction of first degree murder and sentence of death by electrocution.

## I. JURY INSTRUCTION - EYEWITNESS IDENTIFICATION

The defendant asserts that the instruction given the jury in this case regarding eyewitness identification was inadequate. In support of his claim, he relies upon this Court's decision in State v. Dyle, 899 S.W.2d 607 (Tenn. 1995), rendered after the trial of this case. In Dyle, this Court adopted a new jury instruction, which must be given whenever identification is a material issue.[6] Id. at 612. The instruction, which requires the jury to evaluate the evidence in light of several explicit factors, is set out below.

> One of the issues in this case is the identification of the defendant as the person who committed the crime. The state has the burden of proving identity beyond a reasonable doubt. Identification testimony is an expression of belief or impression by the witness, and its value may

---

[6]In Dyle, we stated that "[i]dentity will be a material issue when the defendant puts it at issue or the eyewitness testimony is uncorroborated by circumstantial evidence." Id. at 612.

depend upon your consideration of several factors. Some of the factors which you may consider are:

> (1) The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;

> (2) The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;

> (3) The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and

> (4) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

> Again, the state has the burden of proving every element of the crime charged, and this burden specifically includes the identity of the defendant as the person who committed the crime for which he or she is on trial. If after considering the identification testimony in light of all the proof you have a reasonable doubt that the defendant is the person who committed the crime, you must find the defendant not guilty.

Dyle, 899 S.W.2d at 612. With respect to the applicability of the rule adopted in Dyle, we stated as follows:

> this instruction must be given when identification is a material issue and it is requested by defendant's counsel. Failure to give this instruction under these circumstances will be plain error. If identification is a material issue and the defendant does not request the instruction, failure to give it will be reviewable under a Rule 52 harmless error standard. This ruling is applicable to cases now on appeal and to those cases tried after the release of this opinion.

Id. This case was tried before the issuance of the decision in Dyle, but was pending on appeal at the time of its release. Accordingly, the rule announced in Dyle applies to this case, and we must determine whether the trial court's failure to give the Dyle instruction is harmless or prejudicial error. Tenn. R. Crim. P. 52(a) ("No judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits.")

The defendant contends that the error is prejudicial because the instruction actually given, unlike the Dyle instruction, did not inform jurors that identification testimony is an expression of belief or impression by the witness, and did not instruct the jurors to consider occasions on which the eyewitness failed to make an identification. Id. at 612. The defendant argues that the failure to give the Dyle instruction may have affected the verdict in this case since the eyewitness, Harris, initially had stated that he could not identify anyone nor provide a description because the assailants had been wearing ski masks. The State concedes that the failure to give the instruction was error, but argues the Court of Criminal Appeals correctly held the error harmless since the failure to give the Dyle instruction does not affirmatively appear to have affected the outcome of this trial.

With respect to identity, the trial court in this case charged the jury as follows:

> The Court charges you that the identity of the defendant, Perry A. Cribbs, must be proven in the case on the part of the State to your satisfaction beyond a reasonable doubt. In other words, the burden of proof is on the State to show that the defendant now on trial before you is the identical person who committed the alleged crime with which he is charged. In considering the question of the identity of a person, the Jury may take into consideration the means and opportunity of

identification, if any; whether it was light or dark; the distance intervening; the dress or clothing worn; the character and color of same; the size, height, and color of the individual; whether known to him, and if so, how long, and if seen before, under what circumstances; whether running or moving rapidly, standing still, walking fast or slow at the time claimed to the person testifying; the color of the hair; hat worn; facial expression or features and appearance; whether with or without moustache and beard; whether person said to be identified was white, black, dark, yellow, or light color; masked or not; the voice and speech.

All these things when shown in the proof may be considered by the Jury in determining the question of identity. The word identity means the state or quality of being identical, or the same; it means sameness. Identification means the act of identifying or proving to be the same. The word "Identify" means to establish the identity or to prove to be the same as something described, claimed or asserted.

The Court charges you that if you are satisfied from the whole proof in this case, beyond a reasonable doubt, that the defendant Perry A. Cribbs, committed the crime charged against him, and you are satisfied, beyond a reasonable doubt, that he has been identified as the person who committed the crime charged, then it would be your duty to convict him. On the other hand, if you are not satisfied with the identity from the proof, or you have a reasonable doubt as to whether he has been identified from the whole body of the proof in the case, then you should return a verdict of not guilty.

Considering the totality of the instruction actually given, and the proof in light of the factors delineated in Dyle, we conclude that the failure to give the Dyle instruction does not affirmatively appear to have affected the outcome of this case. The jury was instructed to consider the means and opportunity of identification, including the distance, lighting, and whether the perpetrator was known to the eyewitness. Though not verbatim, this sufficiently encompassed the instruction with respect to the first Dyle factor so that prejudicial error does not result. Moreover, the

-13-

proof clearly established that Harris observed the perpetrator for approximately thirty seconds, from a distance of less than five feet, with a light from the carport illuminating the perpetrator's features. The perpetrator wore a stocking mask, and was a stranger to Mr. Harris.

With respect to the second Dyle factor, the proof is clear that Harris expressed certainty of his identification of Cribbs during a photographic lineup which occurred within six weeks of the crime. Officer McWilliams said that Harris was visibly shaken and emotional when he first observed the photograph of the defendant. Moreover, the photographic lineup does not appear to have been suggestive.

With respect to the third Dyle factor, the proof shows that Harris selected only the photograph of the defendant even though he previously had been presented with two other photographic lineups. However, Harris had been unable to give the police any description of the assailant immediately after the shooting, and police reports reflected that Harris had said the perpetrators had been wearing black ski masks. However, later descriptions given to police by Harris of the perpetrator's facial features, height, and weight matched the defendant. At trial, Harris explained that he had been seriously injured and receiving treatment and sedatives, either in the ambulance or at the hospital, when he had given the initial descriptions. The jury obviously accepted this explanation of the discrepancies.

With respect to the fourth factor, the proof shows that Harris positively identified the defendant from a valid photographic lineup. Harris also positively identified the defendant later at trial.

-14-

Because the instructions given the jury in this case closely resembled the instructions required by Dyle, and because the proof with regard to each of the factors delineated by Dyle was plainly established, we agree with the Court of Criminal Appeals conclusion that the error was harmless. Failure to give the Dyle instruction does not affirmatively appear to have affected the verdict.

## II. AGGRAVATING CIRCUMSTANCE (i)(2)

One of the two aggravating circumstances found by the jury in this case to support imposition of the death penalty is that the defendant had previously been convicted of a felony offense "whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2)(1991). To establish this aggravating circumstance, the State offered the testimony of the Principal Clerk of the Criminal Court Clerk's office in Shelby County during the penalty phase of this trial. She stated, that according to her records, the defendant had four prior felony convictions: two convictions of attempted second degree murder, one conviction for aggravated robbery, and a conviction for second degree burglary. The defendant challenges admission of this proof in two respects.

### A. Second Degree Burglary

First, the defendant claims that the trial court erred in admitting evidence about his previous conviction for second degree burglary because the statutory elements of that offense do not involve the use of violence to the person, and it is

therefore not admissible to prove the statutory aggravating circumstance. Tenn. Code Ann. § 39-13-204(i)(2) (1991 Repl.).

The State concedes that evidence about the defendant's 1989 conviction for second degree burglary should not have been admitted because it was immaterial and ineffective to prove the aggravating circumstance -- that Cribbs previously had been convicted of one or more felonies whose statutory elements involve the use of violence to the person. However, in this case, the State asserts the error was harmless. We agree.

The State did not rely upon the conviction for second degree burglary to prove the aggravating circumstance. Apparently, admission of the evidence about the conviction through the testimony of the Criminal Court Clerk was inadvertent. Indeed, the conviction was never asserted by the State as a valid basis to support the aggravating circumstance.[7] Following the Clerk's testimony, the conviction was not mentioned again in the presence of the jury. It was neither argued by the State, nor submitted to the jury as part of the trial court's instructions. Moreover, the jury's finding of the aggravating circumstance was supported by three other violent felony convictions. Accordingly, the erroneous admission of the testimony regarding the defendant's prior conviction of second degree burglary does not affirmatively appear to have affected the verdict and is harmless.

---

[7]Compare State v. Adkins, 653 S.W.2d 708, 716 (Tenn. 1983); State v. Johnson, 661 S.W.2d 854 (Tenn. 1983) (Finding prejudicial error where the State relied upon evidence of nonviolent felonies to establish the aggravating circumstance).

-16-

## B. Attempted Second Degree Murder

The defendant next insists that his two prior convictions for attempted second degree murder do not qualify as felonies "whose statutory elements involve the use of violence to the person." He bases his argument on the statutory definition of the offense of criminal attempt, which is set out, in pertinent part, hereafter.

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
>> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>>
>> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>>
>> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (1997 Repl.). The defendant points out that criminal attempt is a separate offense from the principal offense attempted, and he argues that the statutory elements of criminal attempt do not involve the use of violence to the person. The State responds that because second degree murder involves the use of violence to the person, evidence of the defendant's prior convictions for attempted second degree murder was properly admitted to establish the existence of the aggravating circumstance.

As the Court of Criminal Appeals noted, the attempt statute requires the perpetrator to act "with the kind of culpability otherwise required for the [principal offense]." Tenn. Code Ann. § 39-12-101(a) (1997 Repl.)  Second degree murder, the principal offense underlying the defendant's convictions for criminal attempt, is defined as

(1)     [a] knowing killing of another; or

(2)     [a] killing of another which results from the unlawful distribution of any Schedule I or Schedule II drug when such drug is the proximate cause of the death of the user.

Tenn. Code Ann. § 39-13-210(a) (1997 Repl.).  We agree with the Court of Criminal Appeals that this language supports the classification of the crime of attempted second degree murder as one whose statutory elements involve the use of violence to the person.  This issue has no merit.


## III. PROSECUTORIAL MISCONDUCT


The defendant next contends that prosecutorial argument during the penalty phase resulted in an arbitrary and unreliable sentence and violated his state and federal constitutional rights.  In particular, the defendant says that his sentence should be reversed because of prosecutorial argument: 1) justifying imposition of the death penalty by reference to religious law; 2) implying that the defendant would be eligible for parole unless the death penalty was imposed; and 3) referring to the impact of the murder on the victim's family.

This Court previously has recognized that closing argument is a valuable privilege for both the State and the defense and has afforded wide latitude to counsel in presenting final argument to the jury. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994); State v. Cone, 665 S.W.2d 87, 94 (Tenn. 1984). However, when a prosecutor's argument veers beyond the wide latitude afforded, the test for determining if reversal is required is whether the impropriety "affected the verdict to the prejudice of the defendant." Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). Factors relevant to that determination include:

(1) the conduct complained of viewed in light of the facts and circumstances of the case;

(2) the curative measures undertaken by the court and the prosecution;

(3) the intent of the prosecutor in making the improper arguments;

(4) the cumulative effect of the improper conduct and any other error in the record; and

(5) the relative strength and weakness of the case.

Bigbee, 885 S.W.2d at 809; State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984); Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). In evaluating the defendant's claims, we apply these guiding principles.

**A. Biblical Reference**

The defendant argues that the State's use of a biblical reference to justify imposition of the death penalty violated his rights to due process, a fair trial, separation of church and state, and freedom from cruel and unusual punishment as guaranteed by the First, Fifth, Sixth, Eighth and Fourteenth Amendments of the U.S. Constitution, and Article I, Sections 3, 4, 6, 8, 9 and 16 of the Tennessee

Constitution. The State concedes that quoting from the Bible is impermissible, but contends that the prosecutor's argument in this case, "whatever a man sows, so shall he reap" was merely a metaphor for individual accountability, rather than a justification for imposition of the death penalty. Considered in context and as a whole, the State contends that the prosecutor's argument was not erroneous. Assuming, in the alternative, that the argument was erroneous, the State contends that the error is harmless.

The challenged portion of the prosecutor's closing argument to the jury is set out below:

> And I never liked, quite frankly, I never really feel comfortable using biblical references.... What I want to do--and the only reason I mentioned that is because I tell you quite frankly, I don't feel comfortable even mentioning the biblical references. And the only reference I do want to make is it is written whether it is Koran, New Testament or Old Testament there is one consistent thing, that is: Whatever a man sows, so shall be reaped [sic]. What that means is accountability. It means that there are standards of conduct. It means accountability what you sow, you reap. And that is the only religious thing I get in there and I don't want to interject myself. I just said that. I didn't want anybody to get offended, you know, if I make a biblical reference but that is a very important part in our law, our law in the State of Tennessee. Whatever a man sows, so shall he reap.

> Well what did Perry Cribbs say [sic]? Violence and crime. Pain and suffering. Think what he -- the havoc and the pain that he has reaped upon the family of Linda Harris.

> . . . .

> Mr. Cribbs needs to be held accountable for his life. Whatever a person sows, so shall he reap. Unfortunately a lot of other people have to bear with paying the consequences of this.

It is well-established in Tennessee law that references to biblical passages or religious law during the course of a criminal trial are inappropriate. <u>See</u> <u>State v. Stephenson</u>, 878 S.W.2d 530, 541 (Tenn. 1994)(judge's reference to Bible passage during voir dire); <u>Kirkendoll v. State</u>, 281 S.W.2d 243, 254 (Tenn. 1955) (prosecutor's reference to religious law during closing argument). In the face of this clear and longstanding precedent, the repeated introduction by prosecutors of such references into trials of serious criminal offenses is inexplicable. In this case, the trial court overruled the objection to the improper reference. We note that the trial court should have sustained the objection and given a curative instruction, and we caution trial judges to guard against the interjection of such inappropriate references. However, evaluating the inappropriate remarks of the prosecutor in this case in light of the previously mentioned five factors, we conclude that they did not affect the verdict to the prejudice of the defendant.

Contrary to the defendant's contention, in the context of the entire argument, the prosecutor did not ask the jury to base imposition of the death penalty on religious law. Instead, the prosecutor urged the jury to hold the defendant individually accountable for the crime he had committed. We agree with the Court of Criminal Appeals that, in the context of this case, the prosecutor was using the "reap what you sow" argument as a metaphor for individual accountability. As a result, we view the comments by the prosecutor which implied that Tennessee law embraced the principle of "reap what you sow" as merely an extension of that metaphor. The jury in this case was correctly instructed prior to beginning deliberations that argument of counsel is not evidence and that the judge provides the relevant instructions as to the law. It is well-established that jurors are presumed to follow the instructions given by

the trial judge.    State v. Laney, 654 S.W.2d 383, 389 (Tenn. 1983); State v.

Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985). In addition, we are

convinced, from our reading of the record, that the prosecutor did not intend to

mislead the jury by employing the metaphor to explain individual accountability.

Indeed, the prosecutor expressed discomfort about using the metaphor, but viewed

it as an effective, understandable device for explaining the concept.  Viewed in the

context of the entire proceeding, we agree with the Court of Criminal Appeals that the

error did not affect the verdict to the defendant's prejudice.

## B. Parole Eligibility

The defendant next asserts that the prosecutor's argument improperly implied

to the jury that he would be released on parole unless the jury sentenced him to

death.  The defendant points to the following excerpt from the prosecutor's argument

in support of his assertion.

> There are no winners.  This is just a horrible situation.  The
> defendant goes into custody . . . in 1990 and he is convicted.  In 1993
> is he [sic] out.  He's told us it was a twelve-year sentence.  The
> penitentiary system doesn't work.
>
> He's been convicted of three violent crimes.  . . . [H]e did less
> than . . . three and a half or four years.  The Penitentiary system
> doesn't work.
>
> . . . .
>
> There is no question he's been convicted of these cases.  No
> question that he got out early.  You heard from him.  It wasn't the
> State's proof.  What happened and why it happened is something we
> may never know.  But it does happen.

In our view, the prosecutor's argument was not a reference to parole

possibility, but was instead a comment upon the failure of prior incarceration to

positively effect the defendant's behavior and a valid response to the defendant's claim that he could conduct himself as a decent individual if sentenced to life imprisonment without the possibility of parole.

However, even assuming that the prosecutor's argument could be interpreted as referring to parole possibilities, a review of the record reveals that the error was harmless. The trial court in this case properly instructed the jury that

> A defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty five (25) calendar years of such sentence. A defendant who receives a sentence of imprisonment for life without possibility of parole shall never be eligible for release on parole.

Therefore, even assuming the jury misconstrued the prosecutor's comment to mean that the defendant would be released on parole unless sentenced to death, the instructions given by the trial court were sufficient to clarify the misconception. Accordingly, the jury in this case was clearly and accurately apprised of its sentencing options in accordance with current law. See Tenn. Code Ann. § 39-13-204(e)(2) (1997 Repl.) This issue is without merit.

### C. Victim Impact Argument

The defendant next contends that during closing argument the prosecutor improperly argued about the impact of the killing on the victim's family, particularly about the effect on the victim's surviving daughter. The State responds that the argument in this case was not unduly inflammatory because it only addressed facts that the jury itself could have inferred from the evidence presented during the guilt

stage. The defendant complains about the following portion of the prosecutor's closing argument.

[The defense] says that [a] life without parole sentence is the same as death. I respectfully disagree.

I'm sorry if I sound too strong. And I'm sorry if I raise my mouth. But there is a substantial amount of difference. Because little Michael Harris who is four years old is never going to be able to visit her mother. She will never be [sic] hold her mother. She will never be able to cry to her mother. She will never be able to call her mother on the phone. She won't get letters from her. And she won't be able to write letters to her. She won't be able to call her on the phone or get phone calls for her. She won't be able to tell her about her boyfriends in life. Tell her about her problems. Tell her about her accomplishments.

No, ladies and gentlemen of the jury, not for one second do you believe that life is the same as death. There is a difference and the difference is that whatever happens in our penitentiary system that we may not know about, what we do know is dead certain is that four year old little girl . . . is never going to see her mother again.

. . . .

It is hard to be involved in this case. It is not easy for anybody. It is not pleasant. Let me tell you something that is a whole lot less pleasant than this. Let me tell you something that is a whole lot harder than anything we are going to do today or anything we've done in the last couple of months, and that is having to explain to that little girl where her mother is. And where her mother is never going to come back.

The same floor where Linda Harris played with toys with her three-year-old daughter that is the same floor that she is sitting there with her brains laid out all over the table. That is the sad reality.

. . . .

When [the defense] told you the role of the prosecutor is to seek justice, that is what we do. I can't and you can't bring back Linda Harris for her mother, for her husband, for her daughter. We can't do that. That is true. We can't give Michael Harris back her mother. But we can give her justice. And that is what I ask you to do.

. . . .

-24-

> A life sentence is not the same as death. There is not visitations. There is no letters. There is no radio. All that little girl is going to have is very vague memories of being a three year old child. And all somebody else in her family that's going to have for years and years is memories of trying to explain that.

> . . . .

> [W]e cannot give Michael Harris back her mother. We can't give Sidney Harris back his wife. We [can't] give Mrs. Harris' mother back her daughter. But we can give them justice. That is what I ask you to do.

The argument in this case referred to facts that the jury had learned from proof regarding the circumstances of the crime. Cf. State v. Nichols, 877 S.W.2d 722 (Tenn. 1994). For example, the assailants gained entry to the Harris home through a bedroom window, and, on the videotape of the crime scene, toys were visible in that bedroom. From that proof, the jury learned that the victim had a three-year-old daughter. Much of the prosecutor's argument was designed to address the defendant's request to be sentenced to life without the possibility of parole, and defense counsel's subsequent argument that a sentence of life imprisonment without the possibility of parole is equivalent to the death penalty. The prosecutor pointed out that, unlike the defendant's child, if the jury returned a sentence of life without the possibility of parole, the victim's daughter would be unable to contact her mother.

This Court previously has cautioned that the State may risk reversal by engaging in argument which appeals to the emotions and sympathies of the jury. See, e.g. Bigbee, 885 S.W.2d at 809; Sparks v. State, 563 S.W.2d 564, 569 (Tenn. Crim. App. 1978); 23A C.J.S. Criminal Law § 1270(c)(1989). Indeed, prosecuting attorneys should counsel jurors to base their decision upon a reasoned moral

response to the evidence. See California v. Brown, 479 U.S. 538, 542-43, 107 S.Ct. 837, 839-40, 93 L.Ed.2d 934 (1987). Taken in context and read as a whole, however, the argument in this case was not so inflammatory that it more probably than not affected the verdict to the defendant's prejudice. As the Court of Criminal Appeals recognized, the remarks of the prosecutor simply emphasized information that the jury already knew or could have legitimately inferred from the proof relating the circumstances of the offense. Much of the argument was a response to defense proof and argument. Wide latitude is to be afforded counsel to present closing argument to the jury, but we again caution prosecutors to avoid arguments which appeal to the emotions of jurors. However, in this case, we agree with the Court of Criminal Appeals that the prosecutor's remarks do not constitute prejudicial error requiring a reversal.

## IV. AGGRAVATING CIRCUMSTANCE (i)(7)

The defendant next contends that the death penalty in this case violates the principle announced in State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992)(Drowota and O'Brien, JJ., dissenting), in which a majority of this Court held that "when the defendant is convicted of first degree murder solely on the basis of felony murder," use of the felony murder aggravating circumstance is not permissible because it "does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the U.S. Constitution, and Article I, § 16 of the Tennessee Constitution because it duplicates the elements of the offense." Id., 840 S.W.2d at 346.

In this case, the defendant was charged in separate counts of the indictment with premeditated first degree murder, first degree murder during the perpetration of an aggravated burglary, and first degree murder during the perpetration of an aggravated robbery. The jury returned verdicts of guilt on all three counts of the indictment. At the conclusion of the penalty phase of the trial, the jury returned a sentence of death for each of the three counts of the indictment.

Several weeks later, during the hearing on the motion for new trial, defense counsel argued that the verdict was erroneous because only one person had been murdered and therefore, only one sentence of death was appropriate. Defense counsel also argued that the evidence was insufficient to support the jury's verdict of guilt on the charge of premeditated first degree murder. The State responded that the evidence supported all three convictions. The trial court then made the following observation:

> You are absolutely correct in pointing out that [the defendant] can't receive three death penalties. And, only one should stand. The terms available to the court are that the other verdicts are simply surplusage. It is discretionary with the court as a finder of fact, thirteenth juror, to strike the verdicts, and I will do that.

Upon learning of the trial court's intention to strike two of the verdicts of guilt, the State requested that the verdicts on counts one and three of the indictment, which, respectively, charged premeditated first degree murder and first degree murder during the perpetration of an aggravated robbery, be stricken. The trial court agreed and entered a judgment of conviction on the jury's finding of guilt on count two of the indictment, which charged murder during the perpetration of an aggravated burglary.

Thereafter, in the Court of Criminal Appeals, the defendant argued that when the trial court set aside the convictions for premeditated murder and felony murder in the perpetration of aggravated robbery, a "retroactive Middlebrooks error" resulted. Specifically, the defendant claimed that the jury's finding of the felony murder aggravating circumstance -- the murder was committed while the defendant was engaged in committing burglary -- duplicated the elements of the only remaining valid conviction, first degree murder during the perpetration of aggravated burglary. According to the defendant, application of the aggravating circumstance, therefore, failed to adequately narrow the class of defendants for whom the death penalty is reserved, and should not have been applied under the authority of Middlebrooks. The Court of Criminal Appeals agreed with the defendant's argument, but affirmed the sentence of death upon finding the "retroactive Middlebrooks error" harmless beyond a reasonable doubt under this Court's decision in State v. Howell, 868 S.W.2d 238 (Tenn. 1993).

In this Court, the defendant argues that the error was not harmless under Howell and requires a remand for resentencing. The State, in contrast, argues that this case does not present a Middlebrooks error at all, and urges this Court to reinstate the jury's verdicts of guilt with respect to the charges of premeditated first degree murder and murder during the perpetration of aggravated robbery.

We begin our analysis of this issue with the well-settled legal proposition that no constitutional or statutory provision prohibits a jury from rendering a general verdict of guilty of first degree murder where both premeditated and felony murder are charged and submitted to the jury. Schad v. Arizona, 501 U.S. 624, 111 S.Ct.

-28-

2491, 115 L.Ed.2d 555 (1991); Tenn. Code Ann. § 40-18-111 and -112 (1990 Repl.); State v. Coe, 655 S.W.2d 903 (Tenn. 1983). Even though it is not constitutionally or legislatively required, specificity in the verdict is desirable and conducive to accurate sentencing determinations and effective appellate review. See Schad, 501 U.S. at 645, 111 S.Ct. at 2504. Moreover, as we recently emphasized, verdict specificity is particularly desirable to ensure effective compliance with Middlebrooks. Carter v. State, 958 S.W.2d 620 (Tenn. 1997). The concern expressed by a majority of this Court in Middlebrooks was that the felony murder aggravating circumstance does not sufficiently narrow the class of death-eligible offenders when a defendant has been convicted of first degree murder solely on the basis of felony murder because it duplicates the elements of the underlying offense. When a defendant is convicted of premeditated murder, and the felony murder aggravating circumstance is employed to support imposition of the death penalty, Middlebrooks is not implicated. State v. Hall, 958 S.W.2d 679, 692 (Tenn. 1997); State v. Hurley, 876 S.W.2d 57, 69 (Tenn. 1993) . Likewise, where the felony murder aggravating circumstance is based upon a felony distinct from the one relied upon to prove the offense of first degree murder, there is no constitutional prohibition against the use of the felony murder aggravating circumstance to support imposition of the death penalty. State v. Hines, 919 S.W.2d 573, 583 (Tenn. 1995). Since application of the principle announced in Middlebrooks turns upon the findings of the jury in each case, multiple count indictments which require specific jury findings on premeditated and felony murder should be utilized. Trial courts should instruct the jury to render a verdict as to each count of such an indictment. Obviously, when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of

-29-

conviction for first degree murder. <u>Carter</u>, 958 S.W.2d at 624, n. 6.; <u>Hurley</u>, 876 S.W.2d at 70. However, findings as to each count will aid the trial court and counsel in determining whether, in light of <u>Middlebrooks</u>, the felony murder aggravating circumstance may be relied upon at the penalty phase of the trial to support imposition of the death penalty.

Applying these principles to the facts in this case it is clear that the trial court correctly required the jury to return a verdict as to each count of the multiple count indictment which charged alternative methods of committing the offense of first degree murder. In addition, the trial court also correctly concluded that the defendant could receive only one sentence of death. Only one killing had occurred, and while the jury returned a verdict of guilt on each of the three counts of the indictment, the three counts merely charged distinct modes of committing the same offense--first degree murder.[8] Since the jury found the defendant guilty of only one criminal offense, only one sentence was appropriate. At the penalty phase, the responsibility of the jury was to fix a sentence for the defendant's conviction of the offense of first degree murder. Rather than remedying the jury's error of imposing multiple sentences for the same offense by entering one judgment of conviction for first degree murder and striking two of the sentences entered by the jury, the trial court in this case struck the jury's verdicts of guilt on two counts of the indictment, stating, "the other verdicts are simply surplusage. It is discretionary with the court as a finder of fact, thirteenth juror, to strike the verdicts, and I will do that." As a result, the defendant's conviction of first degree murder is now grounded solely upon the jury's

---

[8]Tenn. Code Ann. § 39-13-202 (1997 Repl.); <u>Hurley</u>, 876 S.W.2d at 70.

–30–

finding that the murder was committed during the perpetration of aggravated burglary. Since the felony murder aggravating circumstance in this case also is based upon the jury's finding that the murder was committed while the defendant was engaged in committing a burglary, the Court of Criminal Appeals correctly held that the trial court's action in striking the verdicts on counts one and three of the indictment resulted in an error under Middlebrooks.

The State says that this Court need only reinstate the jury's verdicts on counts one and three of the indictment to alleviate the Middlebrooks error. We are constrained to disagree. Had the trial court upheld the jury's verdicts with respect to counts one and three of the indictment, reliance upon the felony murder aggravating circumstance would not be precluded by Middlebrooks. However, we are unable to reinstate those verdicts, because, as the Court of Criminal Appeals found, once vacated, the jury's findings with respect to those two counts were rendered void. See Black's Law Dictionary 1548 (6th ed. 1990) (defining "vacate" as "[t]o annul; to set aside; to cancel or rescind. To render an act void; as to vacate an entry of record, or a judgment."); State v. Davis, 613 S.W.2d 218, 221 (Tenn. 1981). Moreover, in striking the jury's verdicts on those two counts of the indictment, the trial court relied upon his authority as the thirteenth juror. It is well-established that when a trial judge sets aside a verdict, he has not approved it as the thirteenth juror, and unless the trial court approves a verdict as the thirteenth juror, the verdict is invalid. Id. Accordingly, we are unable to reinstate the jury's verdicts with respect to counts one and three of the indictment. However, we agree with the State and the Court of Criminal Appeals that the Middlebrooks error is harmless in this case.

A jury's reliance upon an invalid aggravating circumstance is harmless beyond a reasonable doubt if an appellate court can conclude that the sentence would have been the same had the sentencing authority given no weight to the invalid aggravating circumstance. Nichols, 877 S.W.2d at 738. In Howell, this Court stated that when conducting harmless error analysis, it is important

> to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

> . . . .

> [E] ven more crucial than the sum of the remaining aggravating circumstances is the qualitative nature of each circumstance, its substance and persuasiveness, as well as the quantum of proof supporting it. In that respect, the Tennessee statute assigns no relative importance to the various statutory aggravating circumstances. By their very nature, and under the proof in certain cases, however, some aggravating circumstances may be more qualitatively persuasive and objectively reliable than others....

Id., 868 S.W.2d at 260-61.

As we have previously recognized, that is particularly true of the aggravating circumstance remaining in this case, previous convictions of felonies involving the use of violence to the person. Nichols, 877 S.W.2d at 738. Indeed, the remaining valid aggravating circumstance in this case was supported by three valid prior violent felony convictions. The prosecutor did not emphasize the invalid felony murder aggravating circumstance in his argument. No additional proof of the invalid felony murder aggravating circumstance was introduced during the penalty phase. Finally, the nature and quality of the mitigating evidence was weak, consisting of the

defendant's testimony that he had family members with whom he kept in contact; that he followed prison rules while incarcerated; that he had worked in the past; and that he had not committed the crime of which he had been convicted. Applying the Howell analysis to the record in this case, we conclude that the sentence would have been the same had the sentencing authority given no weight to the invalid aggravating circumstance. Accordingly the Middlebrooks error resulting from the trial court's action is harmless beyond a reasonable doubt.

## V. CUMULATIVE ERROR

The defendant's next contention is that this Court should remand for a new sentencing hearing because of the cumulative prejudicial effect of errors occurring in the penalty phase of his trial. The defendant is correct that the combination of multiple errors may necessitate the reversal of a death penalty even if individual errors do not require relief. Bigbee, 885 S.W.2d at 812; see also State v. Brewer, 932 S.W.2d 1, 28 (Tenn. Crim. App. 1996). However, we have carefully reviewed the record in this case and considered the errors assigned by the defendant, both individually and cumulatively, and have determined that none constitute prejudicial error requiring a reversal and remand for a new sentencing hearing.

## VI. PROPORTIONALITY REVIEW

In the recent case of State v. Bland, 958 S.W.2d 651 (Tenn. 1997), this Court discussed in detail the precedent-seeking analysis which has been employed over the past eighteen years to determine whether the death sentence imposed in a particular case is *disproportionate* to the sentence imposed in similar cases. In conducting comparative proportionality review, we begin with the presumption that

the sentence of death is proportional to the crime of first degree murder.  Therefore, as we emphasized in <u>Bland</u>, the purpose of comparative proportionality review is to "eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty."  <u>Id.</u>, __ S.W.2d at ___.

As we had previously explained, and reaffirmed in <u>Bland</u>, comparative proportionality review is not a rigid, objective test. <u>Id.</u>, __ S.W.2d at __, Slip Op. at 23; <u>Cazes</u>, 875 S.W.2d 253, 270 (Tenn. 1994).  We do not employ a mathematical formula or scientific grid, nor are we bound to consider only those cases in which exactly the same aggravating circumstances have been found by the jury. <u>State v. Brimmer</u>, 876 S.W.2d 75, 84 (Tenn. 1994).  After identifying a pool of similar cases, we consider a multitude of variables, some of which were listed in <u>Bland</u>, in light of the experienced judgment and intuition of the members of this Court.  <u>Bland</u>, __ S.W.2d at ___.  With respect to the circumstances of the offense, relevant factors enumerated in <u>Bland</u> include: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. With respect to comparing the character of the defendants, the following factors were listed in <u>Bland</u> as relevant: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder;

-34-

(5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation.

Applying that analysis, we conclude that imposition of the death penalty for the senseless and unprovoked killing of this woman in her own home is not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. The defendant's conduct demonstrates a complete disregard for human life. Cribbs and his partner in crime were interrupted while burglarizing the Harris home. Rather than leaving the residence after ordering Sidney Harris to release his partner, Cribbs instead ordered Harris at gunpoint to sit in a chair. Cribbs told Harris that he was going to shoot him, and then proceeded to follow through on that statement. From his subsequent statements to Cannon, it appears that Cribbs intended to kill Sidney Harris. Before leaving the residence, Cribbs murdered Linda Harris by placing the shotgun against her head and firing. The victim's brains were literally blown out of her skull. There is no logical explanation for the defendant's actions. Linda Harris apparently had been rendered unconscious by the initial attack she sustained upon entering the house. Therefore, she could not have identified Cribbs, a stranger to her, and the unconscious victim could not have provoked Cribbs in any way. There is no apparent motive for the murder, though it possibly could have been a case of mistaken identity in light of the intruder's question to Sidney Harris asking for the "dope." The senseless murder of Linda Harris occurred in her own home, a place where individuals ordinarily enjoy the most security. Cribbs also seriously injured Sidney Harris, who remained in the hospital twenty-two days. Cribbs, a twenty-three-year-old male, previously had been

convicted of three violent felony offenses. There was little proof about his mental, emotional, and physical condition. He testified that he had attended school through the seventh grade, but had dropped out after being expelled for truancy. Cribbs did not cooperate with the police in this case. In fact, he denied involvement in the murder, even after the jury had found him guilty. In conjunction with his claims of innocence, Cribbs said that he regretted that the murder had been committed. There was little proof with respect to the defendant's capacity for rehabilitation. However, Cribbs stated that he could conduct himself as a decent individual in prison, and claimed that he had followed prison rules during his previous term of incarceration. Considering the nature of this crime and the character of this defendant, this murder places Cribbs into the class of defendants for whom the death penalty is an appropriate punishment. Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In State v. Howell, 868 S.W.2d 238 (Tenn. 1993), the twenty-seven-year-old defendant murdered the clerk of a convenience store by shooting him in the head during the course of a robbery. As in this case the killing was unprovoked and without motive. The defendant did not cooperate with the authorities and did not express remorse. While no specific evidence was presented on the issue of his potential for rehabilitation, Howell had a prior criminal record. The jury found the defendant guilty of first degree felony murder and sentenced him to death upon finding two aggravating circumstances, that the defendant had been previously convicted of felonies involving the use of violence to the person, including first degree murder, armed robbery, and attempted first degree murder, Tenn. Code Ann. § 39-2-

203(i)(2) (1982), and that the murder was committed while the defendant was engaged in committing a felony, Tenn. Code Ann. § 39-2-203(i)(7) (1982). This Court found that the jury's reliance upon the felony murder aggravating circumstance violated the principle announced in Middlebrooks, but upheld the sentence of death, concluding, as in this case, that the error was harmless beyond a reasonable doubt. The mitigation proof related to the defendant's childhood environment and psychological testing.

In State v. Hurley, 876 S.W.2d 57 (Tenn. 1993), the thirty-four-year-old defendant shot the victim once in the head, killing him, and then robbed the victim and burned his body. As in this case, the assault was entirely unprovoked and unexplained. The defendant did not cooperate with the authorities and expressed no remorse for the killing. The jury found the defendant guilty of both premeditated and felony first degree murder, and as in this case, erroneously imposed two sentences of death. This Court upheld the conviction for premeditated first degree murder and the sentence of death which was based upon the jury's finding of the sole aggravating circumstance, that the murder was committed while the defendant was engaged in committing a felony, robbery. Tenn. Code Ann. § 39-2-203(i)(7) (1982). Little or no mitigating proof was presented.

In State v. Bell, 745 S.W.2d 858 (Tenn. 1988), the twenty-eight-year-old defendant was found guilty of both premeditated and felony first degree murder. During the burglary of a residence, the defendant shot a sleeping man when a female resident called out upon seeing the defendant in the dark. At the preliminary hearing, the female resident identified Bell as the assailant, claiming that she had recognized

him at the time of the assault, but because he was a neighbor, had been afraid to identify him to police. As in this case, the senseless murder occurred during the course of a burglary of the victim's home. The jury imposed a sentence of death upon finding three aggravating circumstances, including the felony murder aggravating circumstance. Tenn. Code Ann. § 39-2-203(i)(7) (1982).[9] Though he had no prior violent felony convictions, the defendant did have a prior criminal record, and as in this case, there was little mitigating proof.

In State v. Terry King, 718 S.W.2d 241 (Tenn. 1986), the twenty-one-year-old defendant was convicted of first degree murder for the killing of a female companion. King and the victim had been taking drugs and engaging in sexual relations intermittently throughout the day. When the victim accused King of raping her, he obtained a gun from a friend, ordered her into the trunk of her car, drove to a wooded area, and ordered her out the trunk. The victim begged for her life and offered King money to release her, but he told her to turn her back to him and then shot her with a high-powered rifle in the back of the head. King and an accomplice robbed the victim, hid her body and stole her car. Eventually, King cooperated with the police, and gave a statement admitting his involvement in the killing. The jury imposed the death penalty upon finding four aggravating circumstances, including that the defendant had been previously convicted of the violent felony offenses of first degree murder during the perpetration of armed robbery, aggravated kidnapping, and assault with intent to commit aggravated kidnapping. Tenn. Code Ann. § 39-2-203(i)(2)

---

[9]The jury also found that the defendant knowingly created a great risk of death to two or more persons other than the victim during the act of the murder, and that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. Tenn. Code Ann. § 39-2-203(i)(3) & (6) (1982).

(1982). The jury also found that the murder was committed while the defendant was engaged in committing a felony. Tenn. Code Ann. § 39-2-203(i)(7) (1982).

Finally, in State v. Tommy King, 694 S.W.2d 941 (Tenn. 1985), the thirty-three-year-old defendant was convicted of first degree murder for killing the proprietor of a tavern during the course of a robbery. The victim was shot in the neck and died a week later from the wound in the hospital. The jury found three aggravating circumstances, including that the murder was committed while the defendant was engaged in committing a felony offense, and that the defendant had been previously convicted of felony offenses involving the use of violence to the person. Tenn. Code Ann. § 39-2-203(i)(2) & (7) (1982).[10] Little mitigating proof was offered, but the defendant claimed he was morally justified because the victim had refused to pay him for merchandise, and because the shooting had been accidental. The defendant's claim was contradicted by a great deal of proof which the jury obviously credited.

We have repeatedly emphasized that no two cases are identical, but the above cases have many similarities with the facts of this case. In all five cases, death was caused by a gunshot wound to he head or neck of the victim. The murders were unprovoked and the only apparent motive for each was the defendants' desire to accomplish another criminal act. Like Cribbs, in four of the cases, the defendants had been previously convicted of felony offenses involving the use of violence to the person. Also like Cribbs, many of the defendants offered little proof in mitigation of the offense, and did not cooperate with the police. After reviewing the

---

[10]The jury also found that the defendant knowingly created a great risk of death to two or more people other than the victim, during the act of murder. Tenn. Code Ann. § 39-2-203(i)(3) (1982).

cases discussed above and many other cases not herein detailed, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) (1997 Repl.), and the principles adopted in prior decisions of this Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in an arbitrary fashion, that the evidence supports the jury's finding of the statutory aggravating circumstance, and the jury's finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A) - (C) (1997 Repl.). We have considered the defendant's assignments of error and determined that none require reversal. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge Gary R. Wade, and joined in by Judge Joe B. Jones and Judge William M. Barker. Relevant portions of that opinion are published hereafter as an appendix. The defendant's sentence of death by electrocution is affirmed. The sentence shall be carried out as provided by law on the 17th day of August, 1998 unless otherwise ordered by this Court or other proper authorities.

_____
FRANK F. DROWOTA, III,
JUSTICE

**Concur:**
Anderson, C.J.,

-40-

Holder, J.

Reid, J. - Separate concurring/dissenting opinion.
Birch, J. - Separate concurring/dissenting opinion.

# Appendix
**(Excerpts from the Court of Criminal Appeals' Decision)**

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
MARCH 1996 SESSION

| STATE OF TENNESSEE, | * | C.C.A. # 02C01-9508-CR-00211 |
| Appellee, | * | SHELBY COUNTY |
| VS. | * | Hon. W. Fred Axley, Judge |
| PERRY A. CRIBBS, | * | (Death Penalty) |
| Appellant. | * | |

For Appellant:

A. C. Wharton
District Public Defender
201 Poplar Avenue
Suite 201
Memphis, TN  38103-1947

W. Mark Ward
Assistant Public Defender
147 Jefferson, Suite 900
Memphis, TN  38103

For Appellee:

Charles W. Burson
Attorney General & Reporter

John P. Cauley
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN  37243-0493

James Wax and David Shapiro
Assistant District Attorneys General
201 Poplar Avenue, Third Floor
Memphis, TN  38103

OPINION FILED: **February 14, 1997**

AFFIRMED

GARY R. WADE, JUDGE

**OPINION**

I.

Initially, the defendant claims that the identification evidence was insufficient to support any of the three convictions. On appeal, however, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). A guilty verdict, approved by the trial judge, resolves conflicting testimony in favor of the theory of the state. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978). This court may set aside a conviction only when the "evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e).

Here, one of the victims, Sidney Harris, made an emotional and positive identification of the defendant as the person "that shot me" from a photographic lineup. At trial, he again identified the defendant as the second assailant. There was corroborative evidence. Jacqueline Cannon observed the defendant covered in blood on the night of the murder, described a watch that met the description of one taken from the Harris residence, and overheard the defendant say that he "had shot the lady and the man."

Here, the jury chose to accredit the testimony of the state's witnesses. That was their prerogative. There is sufficient evidence of the identity of the

defendant, in our view, to support each of the convictions.  See <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).

II.

The defendant next contends that the videotape introduced as evidence for the state was unfairly prejudicial.  The defendant asserts that there was no valid reason to display the deceased victim lying in a pool of blood other than to inflame the jury.  The trial court did suppress those portions of the tape which were the most gruesome.  For example, the first deleted segment showed a portion of the victim's brain matter separated from her skull and scattered across the kitchen floor; a second segment displayed the shattered face and skull of the victim.

Rule 403 of the Tennessee Rules of Evidence permits trial courts the discretion to exclude relevant evidence if the probative value of that evidence is substantially outweighed by the dangers of unfair prejudice.  See <u>State v. Banks</u>, 564 S.W.2d 947 (Tenn. 1978).  The trial court must abuse its discretionary authority before this court may consider a reversal.

In this instance, the trial court clearly exercised discretion by admitting only the least gruesome of what is otherwise relevant evidence.  As noted in <u>Banks</u>, "shocking and horrifying the jury emotionally does not assist them in making a reasoned determination of how serious the crime is...." <u>Id</u>. at 952.

In the context of the trial and the circumstances of the crime, it is our view that the trial court did not abuse its discretion. The videotape of the crime scene was probative. While frightening, the videotape was not so inflammatory as to substantially outweigh its probative value. Similar evidence was admitted in State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); while the supreme court ordered that an accompanying narration by the officer should have been excluded, it held that the probative value of the evidence outweighed any possible prejudice. Id. We cannot make a distinction between the facts in this case and those in Van Tran, also a death penalty case, and thus find no error. Other examples of death penalty cases in which crime scene videotapes were used are State v. Bates, 804 S.W.2d 868, 878-79 (Tenn. 1991), and State v. Payne, 791 S.W.2d 10, 19-20 (Tenn. 1990), aff'd, 501 U.S. 808 (1991).

III.

The defendant next complains that the photographic lineup was unduly suggestive. He bases the claim on the fact that police had informed the victim in advance that they had a suspect and that the photograph of the defendant, from the total of seven presented, was the only one that had a question mark by the identification number.

To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification. Simmons v. United States, 390 U.S. 377 (1968). In Neil v. Biggers, 409 U.S. 188 (1972), the Supreme Court held that a reliable identification procedure, even though suggestive, will not negate an

identification of the defendant. The factors determining whether the procedure was too suggestive to accept as reliable were determined to be the following:

> (1)    the opportunity of the witness to view the criminal at the time of the offense;
>
> (2)    the witness' degree of attention;
>
> (3)    the accuracy of the witness' prior description of the individual;
>
> (4)    the level of certainty demonstrated by the witness at the confrontation; and
>
> (5)    the time between the crime and the confrontation.

Id. at 199.

Initially, a physical or a photographic lineup is the preferred means of identification. Either has been determined to be much less suggestive than a "showup," where the victim is either presented with the suspect or a single photograph of the suspect. State v. Terry M. Henderson, slip op. at 5, No. 01C01-9401-CR-00012 (Tenn. Crim. App., at Nashville, October 6, 1994). Beyond that, the extent to which an identification procedure may suggest a single suspect, even with the Neil v. Biggers factors, is largely subjective. If the procedure qualified as being suggestive, the defendant could have relied on several other facts to support his argument: that the encounter lasted less than a minute, that there was no direct light in the Harris residence, that the defendant wore a stocking over his face, and that Mr. Harris may have suffered diminished capacity due to his injuries. All of that would favor the suppression of the lineup identification. There exist, however, other more significant factors favorable to the state. There was proof that Harris did not know whether or not a photograph of the suspect was in the original array. The victim

testified that the photograph of the defendant was among the third or fourth that he saw and that he immediately recognized the defendant as his assailant. All of the photographs included profile and frontal views of black males with similar complexions, moustaches, and hair length. All of the individuals were dressed in t-shirts and two were wearing jackets. None appear to stand out from the others in any way. The victim looked at several other lineups which did not include photographs of the defendant and he was unable, of course, to identify anyone else. The victim stated that he paid no attention to the numbers underneath the individuals in the photographs before making the identification. To the objective eye, the question mark appears to be associated with the number underneath the photograph and not the individual therein.

In order to determine whether the pretrial photographic lineup was so unnecessarily suggestive as to violate constitutional due process, this court must examine the totality of the circumstances existing at the time of the identification. See Stovall v. Denno, 388 U.S. 293 (1967). Absent a showing by the defendant that the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court. State v. Davis, 872 S.W.2d 950, 955 (Tenn. Crim. App. 1993). By the use of these guidelines, our assessment is that the process was not suggestive. Even if it had been, the photographic identification was still properly admitted into evidence by the use of the Neil v. Biggers criteria. The victim saw the defendant at a distance of less than five feet for over thirty seconds. Despite the stocking, the victim specifically recalled the facial features of the defendant. The victim described the defendant as having a moustache, thick eyebrows, and a large round nose. The height and weight descriptions were consistent with the defendant's

actual appearance.  The victim testified that a beam of light from the carport allowed for a clear view of his assailant.

## IV.

Having found no reversible error in our analysis of the trial, the judgments of conviction are affirmed.  We now turn to those grounds alleged to have affected the propriety of the sentence of death.

## V.

The defendant claims the trial court undermined the defense by illustrating to the jury those statutory mitigating circumstances the defense did not actually raise.  The defendant concedes that the supreme court has consistently recognized this error to be harmless absent a clear showing of prejudice. See State v. Smith, 893 S.W.2d 908, 921 (Tenn. 1994); State v. Teel, 793 S.W.2d 236, 252 (Tenn. 1990); State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986).  He claims prejudice because the prosecutor read the list of statutory mitigators submitted by the defense and argued that the defendant failed to prove any of them.  The prosecutor's actions appear to be little more than an attempt to evaluate the proof; accordingly, any error could be classified as harmless.

## VI.

Next, the defendant claims the trial judge should have instructed the jury that its sentence would actually be carried out to the extent provided by law.

Specifically, the defendant suggests that without the instruction, the jury would speculate that the death penalty might not be carried out and that he might be released in a few years even if sentenced to life without parole. The defendant cites to an instance in the record where a prospective juror, who did not sit on the case, actually questioned the validity of the sentences. The defendant reasons that the comments by the prospective juror and those of the court in issuing its charge may have influenced jurors on the panel.

Our supreme court has consistently found this special request made by the defendant to be improper. See Van Tran, 864 S.W.2d at 481; State v. Caughron, 855 S.W.2d 526, 543 (Tenn. 1993); State v. Payne, 791 S.W.2d 10, 21 (Tenn. 1990), aff'd, 501 U.S. 808 (1991); State v. Melson, 638 S.W.2d 342, 367 (Tenn. 1982). So, without further comment, we reject the contention of the defendant.

The defendant also insists that the trial court committed reversible error by refusing to instruct the jury that it could consider sympathy when deciding on a sentence. He argues that the trial court should not have charged the jury to render its verdict on the law and the facts rather than any sympathetic notions for the defendant. By rejecting this argument, the trial judge acted in perfect accordance with established precedent. See State v. Smith, 893 S.W.2d 908, 921 (Tenn. 1994); State v. Bigbee, 885 S.W.2d 797, 814 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 168 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, we hold that this claim is without merit.

VII.

While acknowledging that the supreme court has consistently upheld the death penalty statute under similar attacks, the defendant insists that our statute fails to meaningfully narrow the class of death eligible defendants. He contends that the death sentence is imposed capriciously and arbitrarily; that electrocution is cruel and unusual punishment; and that the appellate review process is constitutionally inadequate.

Based upon a long line of authority, we must reject each claim. See State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994); State v. Smith, 857 S.W.2d 1 (Tenn. 1993); State v. Black, 815 S.W.2d 166 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589 (Tenn. 1990); State v. Teel, 793 S.W.2d 236 (Tenn. 1990); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989).

Specifically, the defendant argues that our statutory scheme fails to meaningfully narrow the class of death eligible defendants. Our supreme court reviewed and dismissed this argument in State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993).

The defendant also contends that the statute is unconstitutional because district attorneys have unlimited discretion in whether to seek the death penalty or not. Our supreme court rejected this argument in Brimmer, 876 S.W.2d at 86. See also Cooper v. State, 847 S.W.2d 521, 536-38 (Tenn Crim. App. 1992).

-51-

Next, the defendant insists that the statute is unconstitutional because it is imposed in a discriminatory fashion. This very argument was rejected by the supreme court in Brimmer, 876 S.W.2d at 87 n. 5. See also State v. Evans, 838 S.W.2d 185, 196 (Tenn. 1992).

Next, the defendant complains that the denial of individual sequestered voir dire of prospective jurors in capital cases violates constitutional principles. In Cazes, 875 S.W.2d at 269, our supreme court rejected this contention. See also Caughron, 855 S.W.2d at 542.

Next, the defendant submits that the death qualification process for prospective jurors creates a "prosecution-prone, guilt-prone jury." Noting the contention has also been rejected by the United States Supreme Court, our supreme court rejected this contention as meritless in Teel, 793 S.W.2d at 246.

The defendant alleges that he was unlawfully prohibited from addressing jurors' misconceptions about sentencing. This argument has been routinely rejected by our supreme court. See Brimmer, 876 S.W.2d at 86-87; Cazes, 875 S.W.2d at 268; Black, 815 S.W.2d at 179.

Next, the defendant asserts the jury should have been informed of the effect of a non-unanimous verdict; that is, that the penalty shall be a life sentence. Tenn. Code Ann. § 39-13-204(h). This contention was rejected by our supreme court in Brimmer, 876 S.W.2d at 87, Cazes, 875 S.W.2d at 268, and Smith, 857 S.W.2d at 22-23. In a related argument, the defendant asserts that requiring the jury to

unanimously agree on a life sentence violates the standards enunciated in <u>McKoy v. North Carolina</u>, 494 U.S. 433 (1990), and <u>Mills v. Maryland</u>, 486 U.S. 367 (1988). This claim has consistently been found to be without merit by our supreme court. <u>See</u> <u>Brimmer</u>, 876 S.W.2d at 87; <u>Thompson</u>, 768 S.W.2d at 250.

The defendant also insists that the statute is unconstitutional because the jury is not required to make the ultimate determination that death is the appropriate penalty. Again, our supreme court has rejected this contention. <u>See</u> <u>Brimmer</u>, 876 S.W.2d at 87; <u>Smith</u>, 857 S.W.2d at 22.

Next, the defendant complains about his being denied the opportunity to present the final closing argument in the penalty phase of the trial. Our supreme court has rejected this contention in at least two prior cases. <u>See</u> <u>Brimmer</u>, 876 S.W.2d at 87 n. 5; <u>Caughron</u>, 855 S.W.2d at 542.

The defendant also contends that death by electrocution is cruel and unusual punishment. Our supreme court has repeatedly rejected this notion. <u>See</u> <u>Nichols</u>, 877 S.W.2d at 737; <u>Cazes</u>, 875 S.W.2d at 268; <u>Howell</u>, 868 S.W.2d at 258.

The defendant submits that appellate review in death penalty cases is constitutionally inadequate. Again, our supreme court has found the claim to be meritless. <u>See</u> <u>Harris</u>, 839 S.W.2d at 77.

Finally, the sentence is neither excessive nor disproportionate to the

penalty imposed in similar cases.  The sentence does not appear to have been imposed in an arbitrary fashion.  Proof of the valid, remaining aggravating circumstance outweighs the proof of mitigating circumstances.

Accordingly, the judgment is affirmed.