# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 7, 2000 Session

## STATE OF TENNESSEE v. TIMOTHY MCKINNEY

**Appeal from the Criminal Court for Shelby County**
**Nos. 98-01434, 98-01435     Joseph B. Dailey, Judge**

---

### No. W1999-00844-CCA-R3-DD  - Filed March 28, 2001

---

We affirm the defendant's convictions of first degree murder and attempted second degree murder and the death sentence imposed on the murder charge, despite the defendant's claims that: (1) the trial court erroneously disallowed expert testimony on the reliability of eyewitness identification; (2) the jury's capital sentencing verdict was infirm; (3) the trial court erroneously allowed the impeachment of a defense character witness during the penalty phase of the trial; (4) the trial court erred in allowing victim impact evidence that related to the impact of the victim's death on persons or institutions other than the victim's family; (5) the trial court erroneously limited the defendant's argument to the jury during the penalty phase; (6) cumulative errors require reversal of the death sentence; (7) the Tennessee death penalty statute is, for various reasons, unconstitutional. We find no error and hold that the death penalty in this case was proportionate to the death penalty imposed in similar cases, the sentence was not arbitrarily imposed, and the evidence supports the jury's finding of a statutory aggravating circumstance and its finding that the aggravating circumstance outweighs any mitigating circumstances. *See* Tenn. Code Ann. § 39-13-206(c)(1) (1997).

### Tenn. R. App. P. 3; Convictions and Sentence of Death Affirmed.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

William Gosnell, Memphis, TN (Trial & Appeal);William D. Massey, Memphis, TN (Appeal), for the Appellant, Timothy McKinney.

Michael E. Moore, Solicitor General; Kathy Morante, Deputy Attorney General; William L. Gibbons, District Attorney General; Phillip Gerald Harris and David Henry, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

The defendant, Timothy McKinney, appeals the first degree murder and attempted second degree murder convictions and the death sentence he received in the Shelby County Criminal

Court. A jury convicted the defendant of the first degree premeditated murder of Donald Williams, and, after finding the presence of the aggravating circumstance of a prior felony involving violence to a person, it imposed the death penalty. The jury also convicted the defendant of the attempted second degree murder of Frank Lee, and the trial court imposed a consecutive Range I sentence of twelve years. In this appeal, the defendant raises the following issues for our review:

1. Whether the trial court erred by denying the defendant's motion for permission to introduce expert testimony on the reliability of eyewitness identification.

2. Whether the jury's verdict was incomplete and erroneous with respect to the only aggravating circumstance found.

3. Whether the trial court erred by allowing the use of the defendant's juvenile adjudication for aggravated assault to impeach a character witness during the penalty phase of the trial and by failing to instruct the jury on the limited use of that evidence; whether the prosecution engaged in misconduct by arguing that the juvenile adjudication was substantive evidence of a pattern of conduct on the part of the defendant which justified imposition of the death penalty.

4. Whether the trial court committed reversible error by permitting a police officer to offer victim impact testimony regarding the victim's status as a Memphis police officer.

5. Whether the trial court violated the defendant's constitutional rights by prohibiting the defendant from responding to the prosecution's penalty phase closing argument.

6. Whether the cumulative effect of all errors at trial violated the defendant's right to a constitutionally reliable, non-arbitrary sentencing determination and to due process of law.

7. Whether requiring the jury to agree unanimously to a life-sentence verdict violates the defendant's rights.

8. Whether the unlimited discretion vested in the prosecutor as to whether or not to seek the death penalty violates the Eighth and Fourteenth Amendments.

9. Whether the death penalty was imposed in a discriminatory manner in violation of the Eighth and Fourteenth Amendments.

10. Whether the failure to articulate meaningful standards for the proportionality review mandated by Tennessee Code Annotated section 39-13-206 violates the defendant's right to due process under the Fourteenth Amendment.

We have heard oral arguments and have reviewed the record, the parties' briefs, and the applicable law. We affirm the convictions and the sentence of death imposed on the first degree murder charge.

FACTS

Trial

On Christmas Night in 1997, off-duty Memphis police officers Frank Lee and Donald Williams were working as security officers at Crumpy's, a Memphis night club. The same evening, the defendant was patronizing the club dressed in a black derby, a colorful sweater, dark pants, gold or yellow shoes with buckles, and a gold vest. When the defendant was "put out" of the club and was unable to locate his car, he became very agitated and threatened to return and "blow up" the club. Lee, Williams, and the defendant looked for the defendant's car, and Williams tried to calm the defendant. At one point, Lee heard the defendant tell Williams, "You didn't have to hit me." Lee and another person separated Williams and the defendant. The defendant then found his car, a Delta 88 Oldsmobile with distinctive taillights and a light top over a dark burgundy or brown body. He got into the car and left.

Stephen Spencer, another club patron and friend of the defendant's, testified that the defendant admitted having had a disagreement with the security guards. The defendant was upset because one of the guards had hit him in the mouth.

Later, the defendant returned to the club, but Lee prevented him from re-entering. The defendant then sat down outside the club beneath a large light, spoke with various individuals leaving the club, and watched Lee and Williams. During this time, Williams called the Memphis Police Department and requested that a patrol car check the area. By the time the requested patrol arrived, the defendant had departed for a second time.

Lee testified that he saw the defendant's car return and park in its original spot. Around this time, on-duty Memphis police officer Ronald Marshall arrived at the club. Marshall testified that Williams pointed out the defendant and related the story of their earlier confrontation. At Williams' request, Marshall briefly detained the defendant. Marshall placed the defendant in his squad car and took the defendant's driver's licence. Williams copied the driver's licence information onto a piece of paper and told Marshall he did not want the defendant arrested. Marshall believed

that the defendant had been drinking but released him, and the defendant left for a third time. Although Marshall did not previously know the defendant, he made an in-court identification of the defendant as the individual whom he detained on the morning of December 26, 1997.

A few minutes after the defendant had departed a third time, Lee saw Williams inside the club with the paper and saw him put it in his coat pocket. Between 2:30 and 3:00 a.m. on December 26, the club patrons began to disperse. Lee and Williams went outside where they stood next to each other and watched technicians load some equipment. Lee heard a gunshot. He turned and saw Williams on the ground and the defendant running away. Lee pursued on foot. When the defendant reached his car, he and Lee exchanged gunfire. The defendant got into his car and left. Lee stayed with Williams until the ambulance arrived.

Donald Williams died three days later. The fatal gunshot wound to his neck had damaged the nerves that control breathing. After the shooting, he was temporarily kept alive via artificial respiration, but he succumbed to his injuries after complications set in, including extensive pneumonia.

Lee was able to identify Williams' assailant. He viewed a photographic array shortly after the shooting, and he recognized the defendant from his "lazy" or "droopy" eyes. Lee testified at trial that he recognized the defendant when, after Williams was shot, they looked at each other "eye to eye" from a distance of about five or six feet in a well-lit area. Although the defendant wore a gold-colored bandana over the lower part of his face and no longer wore the hat or the vest, he still wore the yellow shoes, colorful sweater, and dark pants. Lee had no doubt that the defendant was the shooter and was the man he chased from the scene. Lee said he spent a long time with the defendant earlier that night. Moreover, he clearly saw the defendant under the dome light of the car he got into to drive away, and the car was the same Oldsmobile that the defendant had driven earlier in the evening.

Joyce Jeltz, another club patron, testified that when she left the club at about 2:30 a.m. on December 26, 1997, she encountered a man in the alley. He carried a gun at his right side and moved at a "slow" run. The two security guards were nearby talking, and the man with the gun ran up to one of them and shot him once in the back of the head. Jeltz went back into the club and heard other shots fired outside.

Jeltz said that the shooter was dressed in brown pants and an unbuttoned vest. He wore no hat and appeared to have a sweater or shirt pulled up around this face. Jeltz further described the shooter as approximately five feet, ten inches tall and weighing 160 to 180 pounds. He had a long, slim face. She could not identify the defendant from a photographic array because, she said, the photographs did not show the bodies of the persons pictured. She did select two people, either of whom could have been the perpetrator, based upon the appearance of the eyes in the photographs. One of the two men she selected was the defendant.

On December 27, 1997 the police went to the house of the defendant's girlfriend, Debra Kimble. The house was located approximately 4.1 miles, or four and one-half minutes' drive, from the club. The defendant was not at the house; however, from the living room couch in the home, Officer Aaron Merritt recovered the defendant's derby hat, gold vest, multi-colored sweater, and license plate. Officers arrested the defendant at a Memphis apartment on the afternoon of December 27, 1997.

Michael Karel, who buys and sells used cars, testified that he sold to the defendant the 1984 Oldsmobile Delta 88 that was depicted in photographs at trial as being the vehicle the defendant drove on the night of December 25-26, 1997.

A gunshot residue expert testified that he found a substance consistent with gunshot residue on the front of the defendant's gold vest recovered from Kimble's house. He opined that a gun had been fired in close proximity to the vest. He found no residue on the defendant's other clothing.

The defense presented no evidence at trial. On July 14, 1999, the jury convicted the defendant of the premeditated first degree murder of Donald Williams and of the attempted second degree murder of Frank Lee.

Sentencing

The state's proof during the capital sentencing phase was brief. The state showed that the defendant had been convicted in 1994 of aggravated robbery committed in 1993 with the use of a weapon. It presented victim impact testimony from the victim's widow, who testified how her husband's death had affected her and their two young children, and from a police officer, who testified about the victim's law enforcement career.

The defendant called his stepfather, J.C. Tyus, as a witness. Tyus testified that the defendant had been a typical boy and had not been "real rowdy." According to Tyus, the defendant presented no discipline problems growing up and would not get "real angry," although "if he gets angry he wasn't, like, no violence." Tyus testified that, after getting out of jail on the 1994 conviction, the defendant obtained two jobs. The state cross-examined Mr. Tyus about his knowledge of the defendant's juvenile adjudication for his involvement in firing a shotgun at police officers in 1991. Mr. Tyus was unaware of the defendant's juvenile court guilty plea to aggravated assault against the officers.

The defense presented expert psychological evidence that the defendant suffered from severe learning disabilities. Although despondent as a child, the defendant received no treatment. The defendant presented several witnesses who offered biographical information such as good work habits, good temperament, amiable personality, and church and school background.

The defendant also testified in the sentencing phase. He acknowledged his 1994 aggravated robbery conviction and the juvenile court aggravated assault adjudication for shooting at police officers; however, he minimized his involvement in the offenses. He maintained that an accomplice carried the weapon and effected the aggravated robbery. The juvenile offense, he claimed, was a result of another passenger in the car in which he was riding firing a shot at a police car. He specifically denied getting out of the car and leveling and firing a shotgun toward the police car.

The defendant further denied killing the victim, Donald Williams. He stated that he had been drinking and smoking marijuana all day on December 25, 1997. He admitted that he owned the gold vest which bore a substance consistent with gunshot residue.

The jury found the existence of the aggravating circumstance that the defendant had previously been convicted of a prior felony and that the aggravating circumstance outweighed any mitigating circumstances. It sentenced the defendant to death. On the attempted second degree murder conviction, the trial court imposed a Range I, twelve-year sentence to run consecutively to the first degree murder sentence.

I.

In the defendant's first issue, he claims that the trial court abused its discretion when it denied his pretrial "Motion to Permit the Defendant to Introduce Testimony of Eye Witness Experts Concerning the Nature and Mechanics of Eye Witness Identification."

The appropriateness of admitting expert testimony that generally analyzes the reliability of eyewitness testimony has recently been resolved by our supreme court. In *State v. Coley,* 32 S.W.3d 831 (Tenn. 2000), the court ruled:

> Eyewitness testimony has no scientific or technical underpinnings which would be outside the common understanding of the jury; therefore, expert testimony is not necessary to help jurors "understand" the eyewitness's testimony. Moreover, expert testimony about the eyewitness's accuracy does not aid the jury in determining a fact in issue because the question whether an eyewitness should be believed is not a "fact in issue" but rather a credibility determination.

*Id.* at 833-34. The court noted that Tennessee Rule of Evidence 702 requires that expert testimony "*substantially* assist the trier of fact." *Coley*, 32 S.W.3d at 834 (emphasis in original). Thus, the court found that "general and unparticularized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness whose testimony is in question, does not substantially assist the trier of fact." *Id.* at 838. The court held that "such testimony is inadmissible under Tenn. R. Evid. 702." *Id.*

The holding in *Coley* controls the evidentiary issue now before us. The trial court did not err in its evidentiary ruling to deny the defendant's motion to present the expert testimony.

We must address now the defendant's claim that the rejection of expert evidence on eyewitness testimony denied him his constitutional right to a fair opportunity to present a defense. *See, e.g., Crane v. Kentucky*, 476 U.S. 683, 106 S. Ct. 2142 (1986); *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528 (1984). To be sure, due process of law precludes the use of rules of evidence to deny a criminal defendant a fair opportunity to present a defense. *Trombetta*, 467 U.S. at 485, 104 S. Ct. at 2532. Tennessee appellate courts recognize, as we must, this basic tenet of due process. *See, e.g., State v. Brown*, 29 S.W.3d 427 (Tenn. 2000).

On the other hand, our Rules of Evidence are nothing short of evolved, experience-laden conventions which assist trial courts in reaching just results. Indeed, the United States Supreme Court "never question[s] the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability–even if [a criminal] defendant would prefer to see that evidence admitted." *Crane*, 476 U.S. at 690, 106 S. Ct. at 2146; *see* Tenn. R. Evid. 102 (purpose of Rules of Evidence is "to secure the *just*, speedy, and inexpensive determination of proceedings") (emphasis added). Thus, the proper application of the Rules of Evidence ordinarily metes out to the defendant the very thing he expects and deserves, a fair and just result of trial proceedings.

> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

*Brown*, 29 S.W.3d at 433-34.

As shown above, the exclusion of the expert evidence on eyewitness testimony comports with the Rules of Evidence. We believe that in the present case, the Rules of Evidence are sufficient to protect the defendant's interest in a fair trial and his opportunity to present a defense. We look first to the factor of the reliability of the proposed evidence. We recognize that the exclusion of expert testimony in *Coley* was based upon the requirement of Tennessee Rule of Evidence 702 that the proposed evidence substantially assist the trier of fact. *See* Tenn. R. Evid. 702; *Coley*, 32 S.W.3d at 834. We further recognize that this basis for exclusion is unrelated *per se* to the inherent reliability of the evidence. *See Coley*, 32 S.W.3d at 833-34 (basing finding of no substantial assistance to jury upon eyewitness testimony having "no scientific or technical underpinnings which would be outside the common understanding of the jury"); *see also* Tenn. R. Evid. 703; *McDaniel v. CSX Transportation*, 955 S.W.2d 257, 265 (Tenn. 2000) (listing factors to determine the reliability of scientific evidence). On the other hand, the *Coley* court's concern that the expert testimony be geared to specific witnesses as opposed to witnesses generally may bespeak

that court's concern regarding the reliability of "general" expert evidence about eyewitness testimony. Nevertheless, we find that *Brown's* second factor favors the defendant's position.

The third factor listed in *Brown*, the importance of the interest supporting exclusion, is somewhat neutral. We think it significant that "[a]lthough the testimony of an expert witness may appeal to the trier of fact as being more valid than or superior to other evidence, it is to be received with caution by Tennessee jurors." N. Cohen, *et al.*, Tennessee Law of Evidence § 7.02[11], at 7-30 (4th ed. 2000); *see McDaniel*, 955 S.W.2d at 263 (trial court serves as gatekeeper "to guard the jury from considering as proof pure speculation presented in the guise of legitimate scientifically-based expert opinion") (quoting *Joiner v. General Electric Co.*, 78 F.3d 524, 530 (11th Cir. 1996)). On the other hand, Rule 703 addresses this interest by requiring that expert opinion evidence be disallowed "if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703. The interest advanced by Rule 702 fails to move us in either direction in the present case.

Despite the above *Brown* factors suggesting a modest nod toward the defendant, the issue is ultimately decided for the state, in view of the first *Brown* factor, whether the "excluded evidence is critical to the defense." In our view it is not. The convicting evidence was strong, and although identity was an issue, the state's case was not totally dependent upon eyewitness identification testimony. The jury was shown that Ms. Jeltz could not positively identify the defendant as the offender. Officer Lee's ability to identify the offender *in situ* was greatly enhanced by the fact that he knew the defendant based upon his recent personal conversations with him. The opportunity for misidentification in that situation is not as great as it would be in a case where the eyewitness observes an offender who is a stranger and then attempts to identify him later. Furthermore, the trial court gave the *Dyle* instruction to the jury. *See State v. Dyle,* 899 S.W.2d 607, 612 (Tenn. 1995) (prescribing instructions, when identity is a material issue, that would inform the jury about factors to use in evaluating eyewitness testimony and reminding them of the state's burden of proving identity beyond a reasonable doubt). These circumstances in the present case belie any concern that the proposed evidence was critical. Relying primarily upon this factor, we hold that the trial court did not err in rejecting the defendant's expert testimony.[1]

For these reasons, the defendant's arguments about the rejection of his proposed expert evidence gain no purchase.

## II.

In his second issue, the defendant asserts that the jury returned an incomplete and erroneous verdict. Specifically, he claims that the jury (1) failed to properly enumerate the statutory

---

[1] Even if we assume error in the exclusion of the evidence, the error is harmless for precisely the same reasons that we judge the evidence not critical to the defendant's case. *See Crane*, 476 U.S. at 691, 106 S. Ct. at 2147 (error in denying defendant a fair opportunity to present a defense is subject to harmless error analysis). Any error in rejecting the expert evidence is harmless beyond a reasonable doubt. *See Brown,* 29 S.W.3d at 463 (applying *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967), standard for reviewing harmlessness of errors of constitutional dimension).

aggravating circumstance upon which it based its imposition of the death penalty and (2) failed to find that the state had proven the statutory aggravating circumstance beyond a reasonable doubt.

At sentencing, the state relied upon the (i)(2) aggravating circumstance to support imposition of the death penalty. *See* Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 2000) ("The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person"). The state introduced, without objection or rebuttal, evidence of the defendant's 1994 conviction for aggravated robbery.

The trial court gave the following jury instructions:

> Tennessee law provides that no sentence of death . . . shall be imposed by a jury but upon a unanimous finding that *the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances*, which shall be limited to the following:
>
>> The defendant was previously convicted of one (1) or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person.
>
> The state is relying upon the crime of aggravated robbery, which is a felony involving the use of violence to the person.
>
> Members of the jury, the court has read to you the aggravating circumstances which the law requires you to consider *if you find proved beyond a reasonable doubt.*
>
> . . .
>
> If you unanimously determine that at least one *statutory aggravating circumstance . . . ha[s] been proven by the state, beyond a reasonable doubt*, and said circumstance . . . ha[s] been proved by the state to outweigh any mitigating circumstance or circumstances, beyond a reasonable doubt the sentence shall be death. The jury shall reduce to writing the statutory aggravating circumstance . . . so found, and signify that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance . . . outweigh[s] any mitigating circumstances.

(Emphasis added).

The jury returned the following verdict:

> We, the jury, unanimously find the following listed statutory aggravating circumstance . . .: aggravated robbery. We, the jury, unanimously find that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance . . . so listed above, outweighs any mitigating circumstances. Therefore, we, the jury unanimously find that the punishment for the defendant . . . shall be death.

The defendant argues that this verdict is incomplete on the grounds that the jury, rather than enumerating the statutory aggravating circumstance, simply listed "aggravated robbery" as the aggravating circumstance upon which it based its imposition of the death penalty. In the alternative, the defendant argues that if the verdict is complete, it is nonetheless erroneous given the jury's failure to state that the aggravating circumstance itself was proven beyond a reasonable doubt. Ultimately, the defendant assigns as error the trial court's failure to inquire into an inadequate verdict. *See State v. Henley*, 774 S.W.2d 908, 915 (Tenn. 1989).

These issues are waived. The record reflects that the defendant neither made a contemporaneous objection to the verdict nor included these issues in his motion for new trial. Failure to include an issue in the motion for new trial can, and in this case does, result in waiver. Tenn. R. App. P. 3(e); *see State v. Walker*, 910 S.W.2d 381, 386 (Tenn. 1995).

Nevertheless, a thorough review of these issues reveals no error. Despite his assertion that the "present case is indistinguishable," the defendant's reliance upon *State v. Stephenson*, 878 S.W.2d 530 (Tenn. 1994), and *State v. Carter*, 988 S.W.2d 145 (Tenn. 1999), to refute waiver in this case is misplaced because the cases are, indeed, distinguishable on their facts. *Stephenson* involved a capital case in which the jury verdict was "facially void because it in no way complied with the requirements of the applicable law." *Stephenson*, 878 S.W.2d at 555. The jury in that case received: (1) contradictory instructions from the trial court which failed to set out the proper burden of proof for imposition of the death penalty; *and* (2) an outdated verdict form which failed to require a finding that the statutory aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. The result was a jury verdict not authorized by law. *Id.* at 556. *Carter* also involved a capital case wherein the jury signed outdated, invalid verdict forms that reflected an improper burden of proof. *Carter*, 988 S.W.2d at 152. By contrast, the trial court in this case gave *both* thorough jury instructions which clearly delineated the state's burden of proving the statutory aggravating circumstance beyond a reasonable doubt *and* a valid verdict form which properly required a finding that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.

A jury is presumed to follow instructions from a trial court. *See State v. Cribbs*, 967 S.W.2d 773, 784 (Tenn. 1998). The trial court in this case instructed the jury, no fewer than three times, that it must find the existence of the statutory aggravating circumstance beyond a reasonable

doubt. It also instructed the jury that the state was relying upon the defendant's prior conviction for aggravated robbery to satisfy that circumstance and that aggravated robbery involved violence against the person.

Furthermore, our Code makes no requirement of a verbatim statement of the aggravating circumstances. *See State v. Bland*, 958 S.W.2d 652, 661 n. 6 (Tenn. 1997). The verdict form reflects that the jury, *pursuant to the trial court's instructions*, found the state had proven a statutory aggravating circumstance – the defendant's prior conviction for aggravated robbery. The jury listed that conviction as the aggravating circumstance upon which it imposed the death penalty and stated that the circumstance outweighed any mitigating circumstances beyond a reasonable doubt. The jury's findings are clearly those allowed by the statute and permit effective appellate review of the sentence.

It is clear that the jury found the existence of the (i)(2) aggravating circumstance beyond a reasonable doubt, and the verdict in this case is adequate.

III.

In his third issue, the defendant argues that the trial court erred by permitting the state to attempt to use his juvenile adjudication for aggravated assault to impeach the testimony of his step-father, J.C. Tyus.

At sentencing, the defendant's step-father, J.C. Tyus, testified on the defendant's behalf. His testimony reflected that he had been married to the defendant's mother over twenty-five years and was the only father the defendant had ever known. Tyus testified that as a small child, the defendant "wasn't a real rowdy son . . . [h]e wasn't really running around like a rowdy son he was just like any other children, you know, but he really wasn't bad, or nothing like that." Tyus also stated that the defendant "wouldn't get real angry, but if he gets angry he wasn't, like no violence." Tyus denied that the defendant had any outbursts or discipline problems while living at home.

Prior to cross-examination, the state sought permission at a bench conference to impeach Mr. Tyus. The state argued that Tyus was portrayed by the defense as a someone who knew the defendant well and who characterized the defendant as a peaceful, non-violent individual. In its proffer, the state submitted a copy of the juvenile court record reflecting the defendant's April 1991 guilty plea in juvenile court to aggravated assault. The trial court granted the state permission to use the adjudication for impeachment purposes.

On cross-examination, Mr. Tyus reiterated that the defendant did not have any problems with anger or violence growing up. In response to the state's queries regarding the defendant's April 1991 juvenile adjudication, Tyus denied knowing that the defendant was involved in a drive-by shooting or that he had leveled and fired a shotgun at the arresting officers. The state, however, did not attempt to prove the aggravated assault adjudication. Actual evidence of the prior

-11-

offense was not admitted into evidence until the defendant testified about it on direct examination later in the penalty phase.

The defendant argues that the trial court erred in allowing cross-examination about his juvenile adjudication to impeach Tyus and in failing to give a limiting instruction to the jury that the evidence was introduced for impeachment purposes only. The state counters that the trial court properly followed the dictates of *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998), in permitting Tyus' impeachment, and while conceding that the trial court erred by failing to give a limiting instruction, the state asserts that the error was harmless.

Evidence Rule 405 governs the impeachment of character witnesses. Tenn. R. Evid. 405. It provides that in "cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion," but it requires adherence to specific procedures and conditions before cross-examination inquiry may be made "into relevant specific instances of conduct." *Id.* First, counsel must apply to the court before introducing a specific instance of conduct to impeach a character witness; second, the trial court must conduct a hearing to determine the relevancy of the proposed inquiry; third, the trial court must determine a reasonable factual basis for the inquiry exists; and fourth, the trial court must determine that the probative value of the instance of conduct outweighs its prejudicial effect. *Nesbit*, 978 S.W.2d at 881-83. In addition to these Rule 405-based requirements, our supreme court has said that the trial court must instruct the jury "that the specific acts of conduct were admitted for the limited purpose of evaluating the credibility of the character witness." *Id*. at 883.

At this juncture, we recognize that there are two different trial court actions being challenged here. The Rule 405 requirements for cross-examining a character witness about specific instances of misconduct are designed to assure that the *cross-examination* is itself acceptable and not necessarily to assure that *evidence* is acceptable. *See* Tenn. R. Evid. 405(a) (establishing conditions for "allowing inquiry on cross-examination about specific instances of conduct"). On the other hand, *Nesbit* requires that the trial court must instruct the jury "that the specific acts of conduct *were admitted* for the limited purpose of evaluating the credibility of the character witness." *Nesbit*, 978 S.W.2d at 883 (emphasis added). This requirement is geared to addressing the jury's use of admitted evidence. *See* Tenn. R. Evid. 405, Advisory Comm'n Comments.

First, we consider the decision to allow the impeachment. Prior to cross-examination, the state sought permission to introduce evidence of that specific instance of the defendant's conduct in order to demonstrate the fallibility of Mr. Tyus' opinion, and the trial court conducted a bench conference outside the jury's hearing. *See* Tenn. R. Evid. 405(a)(1). The state presented a copy of the defendant's juvenile court adjudication for aggravated assault which unequivocally established a "reasonable factual basis" for the specific instance of conduct to be used for impeachment. *See Nesbit*, 978 S.W.2d at 883. The trial court considered the basis for the state's request and then permitted use of the adjudication on the basis that it showed bias by the witness and knowledge (or lack thereof) of the defendant and his activities. Although not explicitly finding that the probative value of the evidence outweighed its prejudicial effect, the court implicitly determined that probative

value outweighed prejudice. This determination is amply supported by the record. *Id.* The decision to allow the impeaching cross-examination was not erroneous.

Now we must determine whether the failure to give a limiting instruction was error. We note that, in *Nesbit*, the evidence was admitted into evidence when the cross-examined character witness acknowledged hearing about tales of Nesbit's misconduct. *Id.* at 884. In the present case, however, the character witness did not admit knowing that the defendant had assaulted an officer or had received a juvenile adjudication resulting from this assault, nor did the state introduce independent proof of the assault or resulting adjudication.[2] Under these circumstances, we question, therefore, whether the *Nesbit* requirement of a limiting instruction is implicated. Nevertheless, we recognize that the cross-examination raised the specter of the defendant's prior commission of aggravated assault, and we will review the effect of the trial court's failure to give a limiting instruction as if the evidence was introduced. *See* Tenn. R. Evid. 405, Advisory Comm'n Comments (implying that mere cross-examination about "rumors," as opposed to the witness acknowledging the "rumors," may require the limiting instruction).

In our view, if the failure to give the limiting instruction was error, it was harmless. *See* Tenn. R. Crim. P. 52(a). Evidence of the defendant's prior aggravated assault was substantively admissible to contradict the defendant's temperate nature, a material fact shown by the character witnesses. When "fact contradiction" involves controverting the testimony of a witness, it is sometimes viewed as a process of witness impeachment. *See* N. Cohen, *et al.*, Tennessee Law of Evidence, § 6.07[4], at 6-57 through -62 (4th ed. 2000). In a broader sense, however, when evidence contradicts material, adjudicative facts, the real efficacy of the evidence is substantive fact rebuttal that *incidentally* impeaches a fact or fact witness. *See State v. Electroplating, Inc.*, 990 S.W.2d 211, 231, n.17 (Tenn. Crim. App. 1998). In other words, when "fact contradiction" evidence is relevant to the issues on trial, it is generally admissible as substantive evidence. *Id.*; *see* Tenn. R. Evid. 402. Thus, when Mr. Tyus testified about the defendant's youthful normalcy and peacefulness, the state's cross-examination of him can be viewed not only as a challenge to his efficacy as a character witness, but as a contradiction of the asserted fact. Even though the state may have been required to "take" Tyus' answer as a function of impeachment, we believe that the evidence would logically have been probative on the issue of the defendant's peaceful deportment as a teenager and could have been independently presented. For all we know, the state only declined to present it in rebuttal when the defendant himself presented the evidence on direct examination. Moreover, had the character witness acknowledged the defendant's prior offense or adjudication, the evidence would have functioned substantially, in which event no limiting instruction would have been necessary.

To reach the conclusion that the defendant's juvenile aggravated assault is relevant to issues on trial in the sentencing phase of the present capital case, we need only look to Tennessee Code Annotated section 39-13-204(c), which provides:

---

[2] As an exercise in witness impeachment, the state may have been limited to "taking the witness's answer." If so, it could not have offered independent evidence of the aggravated assault or the resulting adjudication. N. Cohen, *et al.*, Tennessee Law of Evidence, § 4.05[4][d], at 4-108 (4th ed. 2000).

In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include . . . the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors.

Tenn. Code Ann. § 39-13-204(c) (Supp. 2000).

In addition to the character testimony of J.C. Tyus, the defense presented the testimony of three other witnesses at the sentencing phase in an effort to convey to the jury a sense of the defendant's non-violent and non-confrontational character.[3] Plainly, the testimony of these witnesses was offered to present non-statutory mitigation evidence of the defendant's peaceful nature. Evidence of his previous juvenile court adjudication of aggravated assault would logically serve to rebut that non-statutory mitigation evidence. *See id.; State v. Vincent C. Sims*, No. W1998-000634-CCA-R3-DD, slip op. at 24 (Tenn. Crim. App., Jackson, Mar. 14, 2000) (testimony of defendant's relatives that he was not an aggressive person opened the door to state's cross examination about defendant's prior convictions; evidence was admissible under § 39-13-204(c) to rebut mitigating circumstances). As such, the evidence that was suggested in the course of Mr. Tyus' cross-examination, had it been introduced by the state, would have been admissible as substantive evidence in rebuttal or, in other words, to contradict mitigating evidence. If it can be said that the trial court erred in not giving the instruction, in view of the evidence being "suggested" but not "introduced" as to the substantive issue, then surely the error is harmless.

The harmlessness of any error is further illustrated by pointing out again that it was the defendant himself who actually introduced *evidence* of his juvenile court adjudication of aggravated assault. On direct examination during the sentencing phase, he admitted this adjudication. It may well be that the defense intended to steal the state's impeachment thunder by admitting the adjudication, and to that end, the defense may have intended that the use of this direct-

_____

[3] Tawanda Waterman, the defendant's girlfriend, testified that the defendant treated her "real nice, respect [sic]" and that she never witnessed him get angry.

Linda Moshier, the wife of the defendant's former work supervisor, testified that she and her husband developed a friendship with the defendant and that she never witnessed any angry outbursts or problems with the defendant. Moshier also testified that she had "seen him several times just step away from people who wanted to start problems with him" and that "[the defendant] indicated . . . that he did not want trouble in his life, he had been down that road."

Zacharias Stewart testified that he had known the defendant for eighteen years and that they had grown up in the same church. The defense introduced a drawing given to Stewart by the defendant which Stewart described as representing "that after he was finished with his time [the defendant] was looking to do . . . good and better things." Stewart stated that "[the defendant] had a great personality . . . all through the years that we went to church together we kind of had a tight bond . . . he was like a brother to me." On cross-examination, the witness agreed that his and the defendant's church did not teach violence as a way to resolve conflict and that assassination or vindictive behavior is against the teachings of the church.

testimony evidence would be limited to impeachment purposes. We observe, however, that the state would not have been permitted to use the adjudication to impeach the defendant. *See* Tenn. R. Evid. 609(d) ("Evidence of juvenile adjudications is generally not admissible under this rule."). Moreover, the defendant apparently made no request for limiting instructions. All in all, we conclude that, especially in the absence of a request for a limiting instruction, the evidence introduced by the defendant was available for unrestricted use by the jury. *See State v. Smith*, 24 S.W.3d 274, 279-80 (Tenn. 2000). Thus, for this additional reason, we conclude that the trial court did not err when it failed to give the limiting instruction mandated by *Nesbit*.

As an adjunct to his argument that the trial court erred in failing to give a limiting instruction, the defendant also claims that the prosecution engaged in misconduct by arguing in closing that the conviction was substantive evidence of a pattern of conduct by the defendant which justified imposition of the death penalty. In light of our conclusion that the evidence was admissible substantively, this claim fails to discredit the sentence.

IV.

In his fourth issue, the defendant maintains that the trial court committed reversible error by permitting Memphis Police Officer Michael Clark to offer victim impact testimony at the sentencing phase of his capital murder trial. According to the defendant, Officer Clark's testimony was not authorized by statute or case law, and in this particular case the testimony generated an unacceptable risk that the jury would impose the death penalty because the defendant had murdered a law enforcement officer.

a. Admissibility.

The constitutional debate over the admissibility of victim impact testimony at capital sentencing hearings has been spirited in recent years. *See Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597 (1991); *South Carolina v. Gathers*, 490 U.S. 805, 109 S. Ct. 2207 (1989); *Booth v. Maryland*, 482 U.S. 496, 107 S. Ct. 2529 (1987). What has emerged from and has been settled by the debate is that if a state "chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment [to the United States Constitution] erects no per se bar." *Payne*, 501 U.S. at 827, 111 S. Ct. at 2609. This principle laid to rest the previously held beliefs that "evidence relating to a particular victim or to the harm that a capital defendant causes a victim's family do not in general reflect on the defendant's 'blameworthiness,' and that only evidence relating to 'blameworthiness' is relevant to the capital sentencing decision." *Id.* at 819, 111 S. Ct. at 2605.

Following the decision in *Payne,* our supreme court then laid to rest any lingering doubt that victim impact testimony at a capital sentencing trial might be foreclosed by the Tennessee Constitution. *See State v. Shepherd*, 902 S.W.2d 895, 907 (Tenn. 1995); *State v. Brimmer*, 876 S.W.2d 75, 86 (Tenn. 1994) (victim impact evidence and argument not barred per state constitution). Another hurdle to the admissibility of victim impact evidence and argument was cleared with the

1998 decision in *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998). *Nesbit* held that Tennessee's capital sentencing statute, set forth in Code section 39-13-204(c), authorizes the admission of this type of evidence. Tenn. Code Ann. § 39-13-204(c) (Supp. 2000).

The defendant in *Nesbit* had argued that victim impact evidence was not an enumerated statutory aggravating circumstance and that the case law interpreting Tennessee's capital sentencing scheme had held that the state could not rely upon non-statutory aggravating circumstances to support imposition of the death penalty. *See Nesbit*, 978 S.W.2d at 890. In rejecting that argument, the *Nesbit* court focused on the following language in Code section 39-13-204(c):

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, *the nature and circumstances of the crime*; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors.

Tenn. Code Ann. § 39-13-204(c) (Supp. 2000) (emphasis added). The supreme court ruled, "In our view, the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language *nature and circumstances of the crime*. To conclude otherwise would be equivalent to divorcing the defendant from the crime he or she has committed." *Nesbit*, 978 S.W.2d at 890.

In this case, the defendant introduces a new wrinkle into the field of victim impact evidence and argument. At the capital sentencing trial, Memphis Police Officer Michael Clark testified about the victim's career in law enforcement from 1982 until his death. Officer Clark explained that the victim spent "most of his career . . . in uniform patrol" but had also participated in special assignments with the vice-squad. Officer Clark described the victim's work with the Memphis Police Association as an interim vice-president, a member of the association's negotiating teams, and an editor on the association's annual. He further characterized the victim as a "mediator" as opposed to "a big, let's lock 'em up, policeman." Finally, Officer Clark related to the jury the victim's efforts to obtain a school security assignment which required that he attain a four-year college degree.

During its sentencing phase closing arguments, the state appealed to the jury as follows:

> [The victim] was a 'giant' in our community. [The defendant] took him from us. He took him from his family, from his co-workers. This community is less of a place now, because Don Williams isn't here anymore.

You heard the testimony about his family life, about his professional life, what type of law enforcement officer he was. This is not about vengeance. It is about justice.

. . .

Who speaks for the victims? Who speaks for the victims and their families and their co-workers? I'll tell you who speaks for them, juries. What speaks for them? Just verdicts.

The defendant complains that Officer Clark's testimony did not address the "impact" of the crime on the victim's "family," and he cites to the language in Code section 39-13-204(c) that the trial court "may permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons."

We agree that Officer Clark's testimony did not describe the impact of Donald Williams' death on his family. Indeed, the trial court had specifically instructed the state to limit the information elicited from Officer Clark to the victim's law enforcement career and activities. Thus, the question squarely arises whether personal history and background information about a victim qualify as victim impact evidence. In our opinion, they do.

As outlined by the United States Supreme Court, there are at least three categories of victim impact evidence. All three categories were involved in *Booth v. Maryland*. In that case, a victim impact statement, which was part of a presentence report, was provided to the defendant's jury. The victim impact statement (1) "described the personal characteristics of the victims," (2) described "the emotional impact of the crimes on the family," and (3) "set forth the family members' opinions and characterizations of the crimes and the defendant."[4] *Booth*, 482 U.S. at 502, 107 S. Ct. at 2533. *Booth* condemned all three types of information as "irrelevant to a capital sentencing decision." *Id*. at 503, 107 S. Ct. at 2533.

Thereafter, in *Payne v. Tennessee* the United States Supreme Court "granted certiorari . . . to reconsider our holdings in *Booth* and *Gathers* that the Eighth Amendment prohibits a capital sentencing jury from considering 'victim impact' evidence relating to [1] the personal characteristics of the victim and [2] the emotional impact of the crimes on the victim's family." *Payne*, 501 U.S. at 817, 111 S. Ct. at 2604. While overruling *Booth* in its exclusion of those two categories of evidence, the Supreme Court did not disturb that portion of its opinion in *Booth* that excluded

---

[4] Concerning this third category of information, in *Booth* the victims' son had stated that "his parents were 'butchered like animals,' and that he 'doesn't think anyone should be able to do something like that and get away with it.'" *Booth*, 482 U.S. at 508, 107 S. Ct. at 2535.

-17-

information relating to family members' characterization of and opinions about the crime, the defendant, and the appropriate sentence. *Id*. at 830 n.2, 111 S. Ct. at 2611 n.2.

In *Nesbit* our supreme court recognized the same categories of admissible victim impact information as were at issue in *Payne*.

> Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

*Nesbit*, 978 S.W.2d at 891.

We believe that Officer Clark's sentencing testimony is best described as conveying relevant information about the personal characteristics of the victim, Donald Williams. As such, his testimony qualified as admissible victim impact evidence. Offering the jury "a glimpse of the life which [the] defendant chose to extinguish," recognizes and respects the uniqueness of every individual.

> Every defendant knows, if endowed with the mental competence for criminal responsibility, that the life he will take by his homicidal behavior is that of a unique person, like himself, and that the person to be killed probably has close associates, "survivors," who will suffer harms and deprivations from the victim's death. Just as defendants know that they are not faceless human ciphers, they know that their victims are not valueless fungibles; and just as defendants appreciate the web of relationships and dependencies in which they live, they know that their victims are not human islands, but individuals with parents or children, spouses or friends or dependents. Thus, when a defendant chooses to kill, or to raise the risk of a victim's death, this choice necessarily relates to a whole human being and threatens an association of others, who may be distinctly hurt.

*Payne*, 501 U.S. at 838, 111 S. Ct. at 2615 (Souter, J., concurring).

We do not believe that our capital statutory scheme limits or restricts the source of the information about the personal characteristics of the victim to solely family members or representatives. In 1998, Code section 39-13-204(c) was amended, and the following language was added to the provision: "The court may permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about

the impact of the murder on the family of the victim and other relevant persons." Tenn. Code Ann. § 39-13-204(c) (Supp. 2000). This amendment became effective July 1, 1998.

As of July 1, 1998, the supreme court had not filed its opinion in *State v. Nesbit*. *Nesbit* was decided and released on September 28, 1998. *Nesbit*, as we have explained, held that Tennessee's capital sentencing statute authorizes the admission of victim impact evidence as "one of those myriad factors encompassed within the statutory language *nature and circumstances of the crime*." *Nesbit*, 978 S.W.2d at 890. With the amendment to Code section 39-13-204(c), the legislature ensured that – regardless of the outcome in *Nesbit* – a murder victim's family members could be heard during the capital sentencing proceeding. The amendment, in other words, left no doubt that victim impact evidence was part of the "nature and circumstances of the crime." Accordingly, we believe the statutory amendment is permissive, not restrictive, in nature and does not ban co-workers or employers, for instance, from offering testimony that provides a brief "glimpse" of the victim's life.

b. Due Process.

Neither *Payne* nor *Nesbit* stands for the proposition that all victim impact testimony is admissible. Although not banned by the Eighth Amendment to the United States Constitution, victim impact evidence, nevertheless, may be "'so unduly prejudicial that it renders the trial fundamentally unfair,' thus implicating the Due Process Clause of the Fourteenth Amendment." *Nesbit*, 978 S.W.2d at 891 (quoting *Payne*, 501 U.S. at 825, 111 S. Ct. at 2608). For that reason, we have measured the objected-to evidence and argument by the constitutional yardstick of due process. Our examination persuades us that the defendant's capital sentencing hearing was not fundamentally unfair.

To satisfy due process concerns, the state is required, pursuant to *Nesbit*, to "notify the trial court of its intent to produce victim impact evidence," and the trial court must conduct a jury-out hearing to determine the admissibility of the proffered evidence. *Id.* The supreme court in *Nesbit* noted that "[g]enerally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." *Id.* (citing *Payne*, 501 U.S. at 822, 111 S.Ct. at 2607).

In this case, the state notified the trial court of its intent to present victim impact evidence in the form of testimony by the victim's widow, Sharon Williams, and by one of the victim's fellow officers. Upon being notified, the trial court confirmed the state's ability and intent to present evidence of an aggravating circumstance prior to its presentation of victim impact testimony. *See id.* ("[t]he victim impact evidence should not be admitted until the trial court determines that evidence of one or more aggravating circumstances is already present in the record"). The trial court conducted a jury-out hearing at which time it received the state's offer of proof. After

hearing the proffered testimony, the trial court issued specific instructions. It determined that Sharon Williams would be permitted to discuss the impact of Williams' death on the family, although Officer Clark's testimony would be limited to his "personal knowledge of the type of jobs Officer Williams did and the type of officer he was and what made him and his contribution to our community so unique . . . [,] [t]he types of things that a fellow law enforcement officer may shed some light on that perhaps a family member may not be aware of." The trial court further directed the state that the questions posed to Officer Clark had to be "narrowly drawn and specifically directed." The trial court also made a specific finding that the probative value of the proffered victim impact evidence "far outweigh[ed] the prejudicial effect, particularly since . . . the emotional nature of the testimony [would] be minimized."

The state abided by the trial court's limitations on the testimony of Sharon Williams and Officer Jeff Clark. The record contains approximately four transcript pages of testimony by Sharon Williams wherein she concisely described dealing with the fears, nightmares and sense of loss felt by her two young daughters, the financial burden associated with raising and educating her children and caring for two of her husband's relatives without the benefit of his additional income, the victim's involvement in his children's daily lives and activities, and the victim's status as a "father figure" to the children with whom he came into contact in the course of his work in school security.

The record contains approximately three and one-half transcript pages of the disputed testimony of Officer Clark. Pursuant to the trial court's instructions, Officer Clark did not mention his familiarity with the victim's non-work related activities.[5] Instead, Officer Clark testified about the victim's career in law enforcement from 1982 until his death.

Clearly, the victim impact testimony conformed to the *Nesbit* guidelines. It was neither excessively emotional nor overly prejudicial. It was limited information which provided "a brief glimpse into the life of the individual" who was killed and demonstrated the impact of the murder on "relevant other persons." Furthermore, both the court and the prosecution went to great lengths to ensure that the jury did not improperly consider the information provided by Officer Clark.

In its opening statement at sentencing, the prosecution distinguished between evidence offered as proof of an aggravating circumstance and victim impact evidence, stating that "[t]he victim impact evidence cannot and should not be confused with the aggravating circumstance." Further, the prosecution admonished the jury not to consider the victim impact evidence in an emotional way. "[W]e want that evidence to always remain separated in your mind from the aggravating circumstances . . . . You cannot say that the victim impact evidence is an aggravating circumstance. It is not."

_____

[5] Officer Clark's and the victim's children attended the same school, and Clark often observed the victim in the course of non-work related activities.

-20-

The state's closing argument at sentencing was brief, and its comments about victim impact were limited. Furthermore, in rebuttal argument, the prosecution again emphasized the existence of only one aggravating circumstance. "You look at all of these circumstances. You weigh all of them. And when I say circumstances I want to remind you . . . [w]e have one aggravating circumstance." At no point did the prosecution invite the jury to improperly consider the victim impact evidence it presented, and the trial court issued the victim impact evidence jury instruction as required by *Nesbit*. *See Nesbit*, 978 S.W.2d at 892.

Based upon the foregoing, we conclude that due process was not offended by the admission in this case of victim impact testimony. The state made application to the trial court before presenting the disputed evidence. The trial court conducted a jury-out hearing after which it limited the testimony of Officer Clark to those details about the victim's life which were solely work-related. The prosecution took appropriate steps to avoid any jury confusion regarding victim impact testimony and aggravating circumstances. The prosecution also made minimal references to the victim impact evidence in its closing, so as to avoid the jury's misuse of that evidence. Finally, the trial court gave the required jury instruction to guide the jury's proper consideration of the victim impact evidence.

Accordingly, we affirm the trial court's actions on this issue.

V.

The defendant contends next that the trial court violated his constitutional rights and committed reversible error at sentencing when it denied his request to respond to the prosecution's closing argument by revisiting the trial testimony of witnesses Frank Lee and Joyce Jeltz. It is not entirely clear to us whether the defendant is claiming that the trial court improperly restricted the defendant from offering evidence that mitigated his culpability or that the trial court abused its discretion in limiting his closing argument at the sentencing phase. Nonetheless, in either event we are not persuaded that error occurred.

Tennessee Code Annotated section 39-13-204(c) provides that evidence may be presented at a capital sentencing hearing "as to any matter that the court deems relevant to the punishment and may include . . . the nature and circumstances of the crime . . . and any evidence tending to establish or rebut any mitigating factors." The statute also notes that evidence deemed by the trial court "to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence." Tenn. Code Ann. §39-13-204(c) (Supp. 2000).

In *State v. Hartman*, a direct appeal of a capital case, the Tennessee Supreme Court held that "[t]he issue of guilt or innocence is not relevant to punishment" and affirmed the trial court's holding that "the testimony tendered by defendant to attempt to convince the jury of his innocence was inadmissible at the sentencing hearing." *State v. Hartman*, 703 S.W.2d 106, 119 (Tenn. 1985); *see also State v. Adkins*, 725 S.W.2d 660, 663 (Tenn. 1987); *Workman v. State*, 868 S.W.2d 705, 710 (Tenn. Crim. App. 1993).

Ten years after *Hartman* was decided, our supreme court then noted in *State v. Teague* that evidence of the defendant's innocence may be admissible *if* it relates to the circumstances of the crime or to the aggravating or mitigating circumstances. *See State v. Teague*, 897 S.W.2d 248, 252, 254 (Tenn. 1995). This distinction arose (1) from the recognition that capital re-sentencing trials will be conducted wherein the defendant continues to maintain his innocence and (2) from concern that the bifurcated nature of a capital prosecution could be manipulated upon re-sentencing to exclude guilt phase evidence from consideration in the sentencing phase. *See id.* at 252 (quoting *State v. Stewart*, 341 S.E.2d 789, 790-91 (1986)) ("It is unjust to exclude appellant's alibi evidence as a matter of law from the consideration of the resentencing jury merely because the appellant did not receive a proper sentencing hearing in the first trial.").

In this case, we need not explore the distinction set forth in *Teague* for two reasons. First, the trial court did not exclude "evidence" that the defendant was seeking to introduce during the sentencing hearing. Rather, the trial court ruled that the defendant could not remind the jury in closing argument in the sentencing hearing of testimonial evidence that already had been offered and accepted during the earlier trial phase of the capital prosecution. The sentencing jury had heard the trial testimony of Frank Lee and Joyce Jeltz. Lee testified that the defendant was not wearing a vest when he shot Don Williams. At trial Jeltz identified the defendant's vest as being worn by the shooter, but she admitted on cross-examination that she did not mention a vest in her initial description to police.

The second reason why *Teague* does not control the defendant's claim is that the jury that returned the death penalty verdict is the same jury that heard the evidence and returned the verdict finding the defendant guilty of capital murder. The concerns expressed in *Teague* about re-sentencing trials do not apply in this case.

Finally, we discern no error if the defendant's claim is reviewed under the theory that the trial court abused its discretion in disallowing the requested argument. The control of closing argument rests largely within the sound discretion of the trial court, and this court will not interfere with that discretion absent clear abuse. *See Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975); *State v. Thomas*, 755 S.W.2d 838, 843 (Tenn. Crim. App. 1988). *Cf. Herring v. New York*, 422 U.S. 853, 858, 95 S. Ct. 2550, 2553 (1975) (not allowing defendant's counsel to make a closing summation to the jury impinges on the right to effective assistance of counsel).

By seeking to revisit Lee's and Jeltz' trial testimony in this case, the defendant sought to shed doubt (sometimes referred to as residual or lingering doubt) on his identity as the shooter and thus have the jury reconsider its determination that he committed first degree murder. However, the issue of the defendant's guilt was not before the jury for its reconsideration.

Confusing or irrelevant arguments should not be permitted at trial. *See Burns v. State*, 591 S.W.2d 780, 785 (Tenn. Crim. App. 1979); *Brazelton v. State*, 550 S.W.2d 7, 9-10 (Tenn. Crim. App. 1974). We conclude that the trial court did not abuse its discretion when it prohibited defense counsel from arguing at sentencing residual or lingering doubt. *See State v. Bigbee*, 885

S.W.2d 797, 813 (Tenn. 1994) (residual doubt not a fact about the defendant or the circumstances of the crime, but rather is a state of mind somewhere between reasonable doubt and absolute certainty of guilt).

Finding no error, we affirm the trial court's ruling.

VI.

In his sixth issue, the defendant complains that the cumulative effect of all errors at trial violated due process and his right to a constitutionally reliable, non-arbitrary sentencing determination. We have examined, however, all issues raised by defendant and find no more than a single error, and we have ruled above in section III that the single error, if any, is harmless. There are no errors to accumulate.

VII.

In his seventh issue, the defendant argues that requiring the jury to unanimously agree on a life sentence and prohibiting informing the jury of the consequences of a non-unanimous verdict violated his constitutional rights pursuant to *McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227 (1990), and *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860 (1988). "In *McKoy* and *Mills*, the Court held that sentencing schemes that permit jurors to consider only unanimously found mitigating circumstances in determining whether the aggravating circumstances are sufficient to justify imposition of death penalty impermissibly limit the jurors' consideration of mitigating evidence in violation of the Eighth Amendment." *State v. Hall*, 8 S.W.3d 593, 602 (Tenn. 1999).

The trial court's jury instructions in this case with regard to imposition of a life sentence tracked Code section 39-13-204(f). Subsections (f)(1) and (2) specify in pertinent part,

> (1)    If the jury unanimously determines that no statutory aggravating circumstance has been proven by the state beyond a reasonable doubt, the sentence shall be imprisonment for life.
> . . .
> (2)    If the jury unanimously determines that a statutory aggravating circumstance or circumstances have been proven by the state beyond a reasonable doubt, but that such circumstance or circumstances have not been proven by the state to outweigh any mitigating circumstance or circumstances beyond a reasonable doubt, the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life without possibility of parole or imprisonment for life.

Tenn. Code Ann. § 39-13-204(f)(1), (2) (Supp. 2000).

As best we can discern, the defendant actually presents three familiar issues regarding the constitutionality of Tennessee's death penalty scheme. He attacks the requirements (1) that a life sentence be based upon a unanimous verdict; (2) that the jury be deprived of knowledge that a life sentence would be the result of a non-unanimous verdict, *see* Tenn. Code Ann. § 39-13-204(h) (Supp. 2000); and (3) that a finding that aggravating circumstances do not outweigh mitigating circumstances be based upon a unanimous verdict.

These arguments have been rejected by the Tennessee Supreme Court. *See State v. Cribbs*, 967 S.W.2d 773, 796 (Tenn. 1998); *State v. Hall*, 958 S.W.2d 679, 718 (Tenn. 1997); *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994) (cases rejecting attack based upon requirement of unanimity of life-sentence verdict). *See also Cribbs*, 967 S.W.2d at 796; *Brimmer*, 876 S.W.2d at 87 (cases rejecting claim that jury should be informed of effect of non-unanimous verdict). *See also State v. Smith*, 893 S.W.2d 908, 926 (Tenn. 1994); *State v. Nichols*, 877 S.W.2d 722, 735 (Tenn. 1994) (cases rejecting attack upon requirement of unanimity of finding that aggravating circumstances do not outweigh mitigating circumstances). They avail the defendant no relief.

VIII.

In his eighth issue, the defendant argues that the unlimited discretion vested in the District Attorneys General whether to seek the death penalty violates his Eighth and Fourteenth Amendment constitutional rights.

This argument has been repeatedly rejected by the Tennessee Supreme Court. *See, e.g., State v. Smith*, 993 S.W.2d 6, 27 (Tenn. 1999) (affirming this court's conclusion that "[p]rosecutorial discretion used in selecting candidates for the death penalty does not result in any constitutional deprivation"); *State v. Cazes*, 875 S.W.2d 253, 268 (Tenn. 1994); *State v. Brimmer*, 876 S.W.2d 75, 86-87 (Tenn. 1994).

IX.

In his ninth issue, the defendant charges that the discriminatory imposition of the death penalty, based upon race, geography and gender, violates his constitutional rights under the Eighth and Fourteenth Amendments.

Again, this argument has been rejected repeatedly by the Tennessee Supreme Court. *See, e.g., State v. Cazes*, 875 S.W.2d 253, 268 (Tenn. 1994); *State v. Brimmer*, 876 S.W.2d 75, 87, n. 5 (Tenn. 1994); *State v. Smith*, 857 S.W.2d 1, 23 (Tenn. 1993).

X.

In his final issue, the defendant challenges the constitutional adequacy of the comparative proportionality review conducted by the appellate courts. *See* Tenn. Code Ann. § 39-13-206(c) (1997); *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997).

For a reviewing court to affirm the imposition of a death sentence, Tennessee Code Annotated section 39-13-206(c)(1) requires a determination that:

(1)     the sentence was not imposed in an arbitrary fashion;

(2)     the evidence supports the jury's finding of statutory aggravating circumstance(s);

(3)     the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and

(4)     the sentence is not excessive or disproportionate to the penalty imposed in similar cases.

Tenn. Code Ann. § 39-13-206(c)(1) (1997).

In *Bland*, the Tennessee Supreme Court noted that for a death sentence to be disproportionate, the case as a whole must be "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," and it identified several criteria in addition to aggravating and mitigating circumstances which are relevant to the reviewing court's assessment of proportionality. *Bland*, 958 S.W.2d at 667-668.

With regard to similar cases, the court may consider such factors as:  (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. *Bland*, 958 S.W.2d at 667.

With regard to similar defendants, the court may consider: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation.  *Id.*

a.  Review Standards.

The defendant argues that neither Code section 39-13-206 nor *Bland* articulates or applies meaningful standards for proportionality review, thus violating his constitutional right to due process.  Notably, the defendant incorrectly asserts that "[j]udging by the way in which the *Bland* formula has been implemented . . . no death sentence can ever be 'plainly lacking in circumstances,' and no death sentence can ever be found disproportionate."  In fact, this court has recently held that a sentence of death was disproportionate under the circumstances. *See State v. Bobby Godsey*, No.

E1997-00207-CCA-R3-DD (Tenn. Crim. App., Knoxville, Sept. 18, 2000) (holding that death sentence was disproportionate considering the nature of the defendant and the crime compared to defendants and crimes in similar cases, and modifying sentence to life without parole.)

The current Tennessee capital sentencing scheme utilizes a comparative proportionality review similar to that upheld by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909 (1976). *See Bland*, 958 S.W.2d at 662-64. The defendant's argument that the lack of meaningful review standards pursuant to Code section 39-13-206 and *Bland* deprive him of due process has been rejected by the Tennessee Supreme Court and is unavailing. *See State v. Keen*, 31 S.W.3d 196, 223-23 (Tenn. 2000); *State v. Vann*, 976 S.W.2d 93, 118 (Tenn. 1998).

b. Comparative Proportionality Review.

Although not constitutionally required, Code section 39-13-206(c) directs us to conduct a comparative proportionality review of the defendant's death sentence. *See Bland*, 958 S.W.2d at 663. The review begins with the presumption that the sentence of death is proportionate to the crime of first degree murder. *State v. Hall*, 958 S.W.2d 679, 699 (Tenn. 1997); *Bland*, 958 S.W.2d at 662. We utilize a "precedent-seeking approach" wherein the nature of the defendant and the crime is compared with the defendants and crimes in other cases in which the death penalty has been sought. *Id.* at 664. In this way, we seek to identify aberrant sentences by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime," *Bland*, 958 S.W.2d at 662 (quoting *Pulley v. Harris*, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984)), and to eliminate "the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty." *Id.* at 665.

In this case, the jury convicted the 33-year-old, African-American defendant of premeditated, first degree murder. It imposed a death sentence based on the single statutory aggravating circumstance that the defendant had a prior violent felony conviction. *See* Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 2000). The defendant shot and killed the 37-year-old, African-American victim, Donald Williams. Williams, an off-duty police officer and married father of two, was working security for a Memphis night club when the defendant approached him from behind and shot him in the head. Although no motive was established conclusively, it appears the defendant murdered Williams in retaliation for their earlier confrontation which resulted in the defendant being ordered to leave the premises. The record indicates the killing was premeditated, as the defendant returned to the club several hours after his initial confrontation with the victim.

The defendant's criminal history includes a conviction for aggravated assault with use of a weapon and a juvenile adjudication for aggravated assault resulting from his participation in a drive-by shooting. At sentencing, the defendant presented evidence that he has severe learning disabilities which went untreated as a child and contributed to his limited education. He admitted smoking marijuana and drinking alcohol the night of the murder but maintained that he only had a "slight buzz." Although the defendant surrendered to the authorities relatively soon after the killing,

he disposed of the murder weapon and attempted to establish an alibi through his girlfriend. He maintained his innocence throughout the proceedings, going so far as to claim that all the trial witnesses against him were lying. Given his assertion of innocence, there is no evidence of any remorse on the part of the defendant. As for a potential for rehabilitation, the defendant did find employment following his previous incarceration but had only been released for a short time before committing the current offense. The defendant's step-father indicated a belief that the defendant could contribute to society, even if incarcerated.

Considering the nature of this crime and the defendant's character, the appellate courts have approved the death penalty in cases that have many similarities with this case. *See State v. Chalmers*, 28 S.W.3d 913 (Tenn. 2000) (death penalty based solely on the (i)(2) statutory aggravating circumstance for prior aggravated assault conviction); *State v. Henderson*, 24 S.W.3d 307 (Tenn. 2000) (24-year-old African-American left unconscious victim in a room and then returned to kill the victim by shooting him in the head at point-blank range); *State v. Keough*, 18 S.W.3d 175 (Tenn. 2000) (defendant tracked victim to bar where he killed her and the jury found only the (i)(2) statutory aggravating circumstance for prior violent felony conviction); *State v. Smith*, 993 S.W.2d 6 (Tenn. 1999) (victim killed by gunshot to the head and the death penalty imposed based solely on the (i)(2) statutory aggravating circumstance); *State v. Cribbs*, 967 S.W.2d 773 (Tenn. 1998) (unconscious victim shot in head without provocation or purpose); *State v. Adkins*, 725 S.W.2d 660 (Tenn. 1987) (death penalty based solely on the (i)(2) statutory aggravating circumstance); *State v. Goad*, 707 S.W.2d 846 (Tenn. 1986) (death penalty for felony-murder conviction based solely on (i)(2) statutory aggravating circumstance); *State v. Wright*, 756 S.W.2d 669 (Tenn. 1988) (defendant convicted of premeditated first degree murder in shooting deaths of victims and sentenced to death on the basis of a single aggravating circumstance).

Upon our review of the above and other cases, we conclude that this murder places McKinney in the class of defendants for whom the death penalty is an appropriate punishment and that the death sentence imposed by the jury in this case is proportionate to the penalty imposed in similar cases. In accordance with Tennessee Code Annotated section 39-13-206(c)(1), we find (1) the sentence of death was not imposed in an arbitrary fashion; (2) the evidence supports the jury's findings of one statutory aggravating circumstance; (3) the evidence supports the jury's finding that the aggravating circumstance outweighs any mitigating circumstances; and (4) the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases considering both the nature of the crime and the defendant.

CONCLUSION

Based upon the foregoing, the judgment of the trial court and the sentence of death imposed by the jury in the above-captioned case is AFFIRMED.

_____
JAMES CURWOOD WITT, JR., JUDGE